John Crowley, Charles Kern, and Richard T. Criche, Appellees, v. Elgin, Joliet and Eastern Railway Company, Appellant.

Gen. No. 46,096.

Opinion filed March 8, 1954. Released for publication March 24, 1954.

KNAPP, CUSHING, HERSHBERGER & STEVENSON, of Chicago, for appellant; HARLAN L. HACKBERT, of Chicago, of counsel.

LOUIS Z. GRANT, MARION J. HANNIGAN, and EDWARD WOLFE, all of Chicago, for appellees; EDWARD WOLFE, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

John Crowley, Charles Kern and Richard T. Criche filed a complaint in the superior court of Cook county against the Elgin, Joliet and Eastern Railway Com-

pany under the Federal Employers' Liability Act for occupational dermatitis resulting from contact with diesel fuel oil and lubricating oils in the monthly inspection and servicing of defendant's diesel locomotives. A jury returned separate verdicts in favor of each plaintiff, assessing Crowley's damages at $42,800, Kern's at $28,900 and Criche's at $19,500. Defendant's motions for judgments notwithstanding the verdicts or, in the alternative, for a new trial, were denied. A separate judgment was entered in favor of each plaintiff, to reverse which defendant appeals.

The evidence establishes that plaintiffs contracted occupational dermatitis from coming in contact with diesel fuel oils and lubricating oils in the monthly servicing and inspection of defendant's locomotives in the roundhouse at defendant's yard at East Joliet, Illinois. The plaintiffs and the defendant were engaged in interstate commerce. The word "dermatitis" means inflammation of the skin. The causes of dermatitis are varied. It may be caused by bacteria, food or other substances taken internally, virus, pus-forming organisms and fungus. Contact dermatitis, with which plaintiffs are afflicted, results from external contact with some substance which is irritating to the particular individual. Almost any substance, from household articles to industrial processes may cause a contact dermatitis in a susceptible individual. This is true also of chromates in sufficient concentration and of petroleum derivatives. Substances which will cause a dermatitis in one individual may not cause it in another; individual resistance varies. The external factors involved in contact dermatitis are the extent and frequency of the contact with the irritating substances and the time of individual exposure; personal factors are the susceptibility of the individual, the lightness of his complexion, his age as affecting his capacity to harden resistance to a

new exposure, or his loss of resistance to a previously nonirritating exposure and personal cleanliness in avoiding unnecessary contact with the irritant and in removing the contacted substance by promptly washing the exposed parts of the body. To effect a cure, contact with the offending substance must be terminated. If kept away from the irritation a sufficient length of time, depending usually on the length and extent of prior contact, the individual may become entirely cured, and he may, by following proper precautionary measures, be able to return to his former occupation without further trouble.

The action is predicated upon alleged violation of the Federal Employers' Liability Act, in that the defendant was negligent in failing to take reasonable precautions, discoverable by the exercise of ordinary care, to protect plaintiffs from the occupational hazard inherent in their work in and about diesel fuel and lubricating oils, and that as a result of one or more of the negligent acts of the defendant, each of the plaintiffs became and is afflicted with dermatitis. Defendant maintains that it cannot be held liable for the contact dermatitis with which each plaintiff became afflicted because the evidence fails to prove that it had actual or constructive knowledge of the hazard of dermatitis, or that it was negligent as charged. John Crowley was first employed by defendant in 1913, and except when furloughed for lack of work, he had worked continuously for it since 1922. He was 61 years of age at the time of trial. He was classified as a general machinist. Between 1920 and 1947 he did general repair work in the "back shop" at Joliet on steam locomotives. In 1936 defendant began to replace its steam locomotives with diesel locomotives. The change-over from steam to diesel locomotives was completed by the end of 1949. Crowley had worked in the roundhouse on some occasions and was

familiar with conditions there. In February 1947, by virtue of his seniority, he "bid in" upon a vacancy in the roundhouse at East Joliet, and for the first time started to work on diesel locomotives. He was in good health. Prior to February 1947, he had no contact with diesel fuel oil. He had an eighth grade education. He had not been instructed by the defendant as to the possible ill effects of coming in contact with this oil. No orders, written or otherwise, were received by him on this subject from his superiors. Prior to November 1947, when he first became afflicted with dermatitis, he had no skin affliction of any kind.

Each day a diesel locomotive would be brought into the roundhouse for monthly inspection and servicing. The work would be done by the crew of eight to ten men, two of whom were machinists and two machinist's helpers. In removing the fuel oil filters, the machinist would come in contact with the fuel oil for a few minutes. In removing the lube oil filters and the sump strainer and inspecting the crankcase and bearings, lubricating oils would get on his hands. He did this work every other day. Neither he nor the other plaintiffs had anything to do with mixing the cooling fluid or filling the cooling system or the fuel oil tanks of the engine. In changing the packing in the water pumps, his hands would come in contact with the cooling fluid. When a leak permitted the oil and cooling fluid to mix—and it was hard to say how often that would happen—his only contact with the mixture was that in the water pump and shaft. It was the job of the boiler-maker to drain off the cooling fluid and of the pipefitter to drain off the oil. In this work his hands and other parts of his body would come in contact with diesel and lube oils. He came in contact with these fuels every working day from February 1947 to November 1947, when he first developed a rash on his hands and arms

as far as his elbows. He first went to his family physician in Joliet on November 20, 1947. When his condition did not improve he asked his foreman to send him to the hospital. He was then sent to the Silver Cross Hospital in Joliet, where he saw Dr. William A. Meadows, the local surgeon for the defendant. Dr. Meadows testified that according to his recollection and records, Dr. Albers, his assistant, treated Crowley.

Dr. Meadows diagnosed Crowley's condition as contact dermatitis from diesel oils. He continued to treat him until after January 1948. When the condition failed to improve he sent Crowley to the Northwestern University Clinic in Chicago. On January 2, 1948, Crowley went to the Public Health Institute in Chicago, which referred him to the Northwestern University Clinic, where he was examined and treated 18 to 20 times. When Dr. Meadows first saw Crowley on December 22, 1947, he made a report to defendant's chief surgeon, Dr. R. J. Bennett in Chicago, on the forms provided by the defendant. In that report he found that Crowley's condition was caused by "working near diesel oil" and made a diagnosis of Crowley's malady as "contact dermatitis from diesel oil." Upon the advice of the dermatologist at the Northwestern Clinic, Crowley remained away from work until the latter part of January 1948; then he worked four days. On February 7, 1948, he was again examined by Dr. Bennett, defendant's chief surgeon, who said he would release him to work involving "no dirt, grease or oil." Under the machinist's union agreement, Crowley could not take another machinist's position by displacing another man. He could only bid in on a vacancy. Similarly, the defendant could not transfer him without his consent or refuse to allow him to work at any job to which his seniority entitled him. He reported for work on February 9, 1948, but did not actually return to work

until February 17, 1948. When he returned to work he had a conversation with Paul Verd, defendant's superintendent of motive power, who read and discussed with him a letter, the substance of which was that the doctors had advised him not to work with oils and greases, but that if he returned to work he did so upon his own responsibility.

At this time Crowley had been advised by his family physician that his work was the cause of his dermatitis and by the two company doctors not to return to work around diesel oil, and the dermatologist at the Northwestern Clinic had advised him to remain away from diesel work. He returned to his old job on February 17, 1948, which the defendant could not refuse him or transfer him from without his consent. Although there have since been vacancies in jobs in the back shop upon which he could have bid successfully by virtue of his seniority, he remained at that same job until he bid in another roundhouse job in August 1952. According to the stipulation of the days off duty, Crowley lost 46 days from work through February 1948. He lost several days each month thereafter. The rash spread to his face and neck and later to his legs and feet. He went to Hot Springs for three weeks and his condition improved. He was off work for several weeks in the summer of 1949 because of a spontaneous hemorrhage in the left leg, and during this time away from work his skin "improved tremendously." When he returned to work, the eruption returned within a few days. He was off work because of his skin condition from May 1 to August 10, 1952, losing a total of 73 working days. He went again to Hot Springs. At the end of that period the condition of his skin was improved. At the time of the trial in December 1952, he had dermatitis in a "milder state" on his hands, wrists, forearms and ankles. In the opinion of Dr. Milton Robin, this condi-

tion was permanent because of the length of time and frequency of his exposure. Crowley had lost approximately 329 days from his work on account of the dermatitis from December 1947 to September 1952. His lost time and medical expenses total approximately $5,000.

Charles Kern had worked for defendant as a pipefitter since November 1915, and was the first man on the seniority list. He was 68 years old at the time of the trial. Prior to August 1948, his work as a pipefitter had been assembling, dismantling and repairing the pipes of steam locomotives. Upon the conversion to diesel operations, the character of his work changed and thereafter he worked exclusively on diesel locomotives. His work included tightening, removing and repairing the pipes of locomotives. In disconnecting the pumps and the pipes of the oil systems, his hands would come in contact with the cooling fluid and the fuel oil. Sometimes some might splash on his neck, face or feet. In January 1949, he first noticed a reddening of his hands and a burning irritation. He thought the weather had chapped his hands. Early in February he went to Dr. Meadows, who prescribed an ointment, and then hospitalized him for two weeks. Prior to February 1949, he was in good health and had no skin affliction. He had never made a study of the ill effects of working with diesel oil and did not know prior to that time that contact with the oil would affect him. No one had ever told him of the ill effects therefrom. He first saw Dr. Meadows on February 5, 1949, who found that he had "an itch, rash, on the back of his hands and forearms." On Dr. Meadows' orders he was hospitalized for two weeks. Dr. Meadows treated him for a time and when he apparently did not improve he sent him to defendant's dermatologist, Dr. Irving M. Cobin. Dr. Meadows made a final report of his examination of Kern to de-

fendant's chief surgeon, Dr. Bennett, in which he found the cause of Kern's condition: "Working in diesel oil developed rash on hands" and made a diagnosis of "contact dermatitis of hands and forearms."

Kern returned to work for a few days in April 1949, and the rash flared up again. He went back to Dr. Cobin for treatment and at his direction remained away from work until June 1, 1949. He lost 90 days from work in this period. He continued to work in the round-house until the middle of July 1949. Then as the rash returned, at the suggestion of Dr. Bennett and on his own volition, he transferred to the back shop. After that, on account of the condition of his hands, he lost 3 days from work in August and September 1949, 3 days in 1950 and 4 days in 1951, when his work would occasionally bring him in contact with diesel oil and his rash would flare up. At its worst in April 1949, he had eruptions on his hands, fingers, wrists, arms, temples, neck, buttocks and thighs. By August 1949, the condition had nearly cleared up. At the time of the trial the skin on the fingers, hands, wrists and forearms was "slightly reddened, thickened and dry," the elbows, temples, back, buttocks and thighs being clear. Dr. Robin, testifying for plaintiff, said he had no opinion whether this "fairly mild" eruption was permanent or not, and that if not further irritated, it might clear up altogether. Kern described the present condition of his spine, face and neck as "itchy" and that "since 1949 the condition of my skin has changed very little. It bothers me very bad and the irritation is still severe." He lost a total of 118 days from his work, making the salary loss during that period of time approximately $2,500.

Richard T. Criche was 52 years old at the time of the trial and had 32 years of seniority as a machinist. Prior to 1945 his work had been regularly in the back shop. In 1945 he bid in a job in the roundhouse and

worked regularly on steam locomotives until the conversion to diesel operations in the middle of 1948. His work on diesel engines was of the same general nature as Crowley's. In the early part of 1948 he was assigned to work on diesel locomotives exclusively. In connection with his work on these engines his hands would become saturated with fuel oil and it would sometimes get on his face and clothes. Prior to commencing work on the diesel locomotives he did not know anything about danger from fuel and lubricating oils. No one had given him any instructions about the danger of exposure to the oils. He had an eighth grade education and had never had any training in this connection. The defendant did not furnish him with protective ointments, soaps, scrubbing fluids, gloves or other protective devices prior to June 1949. In June 1949 his skin developed a burning and itchy sensation and had little water blisters. He saw his foreman, who sent him to Dr. Meadows. He was then referred to Dr. Cobin, who commenced to treat him on June 7, 1949. He remained under the care of Dr. Cobin until June 28, 1951. Dr. Cobin diagnosed his ailment as "contact dermatitis." Dr. Meadows, in his official report to Dr. Bennett dated June 7, 1949, found that Criche had developed a rash on both hands from "working in diesel oil," and diagnosed his condition as "contact dermatitis." He saw Dr. Lawless in Chicago 11 times from March to June 1950. He went to Dr. Robin for examination but not treatment on two occasions.

In July and August 1949, he worked as a temporary foreman where he was not exposed to diesel oils and cooling fluids and the eruption cleared gradually. Back at his regular job the rash broke out again and Dr. Cobin took him out of service in January 1950. He was out of service until March 30, 1950, losing 83 days' work. He then gave up the roundhouse job and re-

turned to work in the back shop, where he was only occasionally exposed to oil and dirt on the wheels of the locomotives he was working on. Occasionally he was required to work in the roundhouse a day or two at a time to fill a vacancy, and on account of a reduction in force during the steel strike, he went back to the roundhouse in June 1952, where he started to get a small rash. He was off work from August 7 to October 20, 1952, because of an accidental injury to his right hand. He then returned to the back-shop job. He lost approximately 199 days from his work, or a total salary loss of approximately $1,500. At the time of trial he had a "mild amount of dermatitis on the tops of his hands and wrists," with slight thickening of the skin and increased pigmentation. His condition was "approaching normality" and Dr. Robin had no opinion whether it was temporary or permanent.

█ Plaintiffs were permitted to introduce evidence as to the effects of chromate solution used in the cooling system of the diesel locomotives on their counsel's representation that at times the cooling fluid and fuel oils became mixed together as the result of leakage. There is evidence to support the theory on which the testimony as to the chromate solution was introduced. Defendant purchased its diesel fuel oil from Standard Oil Company under specifications. For use as an inhibitor of scale formation and electrolytic action in the cooling system of its locomotives, the defendant purchased from Dearborn Chemical Company a product known as No. 517, whose formula was a trade secret, but which was about two-thirds bichromate, which was within the general range of the chromate content of similar products. Used in a ratio of 50 ounces of compound to 100 gallons of water, this produced a solution of 1 to 384, or less than $\frac{3}{10}$ths of one per cent chromate. There was no evidence that defendant's specifications for

diesel fuel oil or the cooling solution differed in any respect from those commonly used by other railroads.

Prior to November 1947, when Crowley's dermatitis first appeared, Dr. Bennett, defendant's chief surgeon, knew that chromate in powder form and petroleum in certain concentrations caused skin irritations to some susceptible people. He had never heard of any case of a railroad employee claiming to have contracted such dermatitis. Defendant's general superintendent, Paul Verd, had worked with diesel locomotives since 1935, first in the servicing department of Electro Motive Division of General Motors, which manufactures diesel locomotives, then in successive positions with defendant in charge of diesel operations, interrupted by four and a half years' service in diesel submarine motor maintenance during World War II. He had never heard of any case of dermatitis due to diesel fuel oil until Crowley's case. It was known in 1947 that certain individuals suffered ill effects by coming in contact with solutions containing chromate. Books had been published on this subject. Dr. Cobin testified that it had been known for 22 years that certain oils would produce dermatitis. When he saw Kern and Criche he knew that they had been in contact with fuel oil. When Dr. Meadows first saw Crowley on December 22, 1947, he knew that his condition was caused from "working near diesel oil" and that this plaintiff was afflicted with contact dermatitis from fuel oil, and officially reported to Dr. Bennett on Kern on February 5, 1949, and on Criche on June 7, 1949. On December 22, 1947, Dr. Meadows issued an order that Crowley was not to work around diesel oil. Dr. Louis Schwartz, the senior author of the outstanding text on "Occupational Diseases of the Skin," and who was the organizer in 1930, and until his retirement in 1947, the head of the dermatology department of the United States Public Health

Service, said that at the time of his retirement he had heard of no case of dermatitis of a railroad employee from diesel fuel oils or cooling solutions, and that so far as he knew up to that time there had not been any case of dermatitis in the railroad industry in the use of diesel fuel oil and that he first learned of any such cases a year or two later.

Plaintiffs' counsel interrogated the medical witnesses about their familiarity with certain medical publications, but none of the articles were admitted into evidence. In response to a question as to the period of time the effect of chromate had been known, Dr. Robin referred to the textbook "Occupational Diseases of the Skin" of which Dr. Schwartz was a coauthor, published in 1947, that dealt with and discussed the various industries in which chromates were used and the various reactions from exposure, and in response to a similar question as to knowledge of the effect of petroleum, he referred to the same textbook. On cross-examination he was shown a copy of the book and admitted that in the chapters on dermatitis caused by chromates and petroleum derivatives, there was no reference to those substances as used in the railroad industry. Later Dr. Schwartz testified that not until a year or two after July 1947, did he hear of any such dermatitis cases in the railroad industry. Dr. Robin also referred to an article in the Foreign Letters Section of the Journal of the American Medical Association for October 10, 1931, dealing with skin sensitivity to chromate compounds in the printing industry, and to an article by Dr. Schwartz in the Journal of Industrial Medicine in 1942 dealing with dermatitis among operators of air conditioning equipment. On cross-examination he admitted that he did not know whether chromates were used in the printing and air conditioning industries in

original powdered form or in solution, although the hazard and reaction were different.

Dr. Robin also referred to an article entitled "Can Diesel Fuel Oils Cause Dermatitis" in the August 25, 1945 issue of the Journal of The American Medical Association. This article appeared in the "Queries and Minor Notes" section, a sort of "question box," under a caption that the answers did not represent the opinion of any official bodies. During the cross-examination of Dr. Schwartz it developed that he had written the answer to the question which had been sent in by a Dr. Stivers, and he testified that it was not then a matter of common knowledge that men coming in contact with diesel fuel oil received dermatitis from it; that the question was referred to him for reply because it was not a matter of public knowledge; and that when he answered the question he thought it related to diesel trucks, for the problem of using diesel fuel oil had not then come to his attention.

There was no evidence that anyone connected with the defendant at the time had read any of these publications or that they were circulated among persons in the railroad industry. The first published article shown to have referred to dermatitis in the railroad industry was published November 17, 1951. Each of the plaintiffs had incurred his dermatitis prior to that date. In support of defendant's contention that by 1951 it had taken measures to counteract the dermatitis hazards, it points out that starting in 1949 new washroom facilities had been constructed in the roundhouse, adjacent to the diesel area; that late in 1948 or early in 1949 protective creams and ointments were made available and special detergents with a corn-meal scrubber were supplied at washstands in the roundhouse and later in the new roundhouse washrooms; that early in 1950, by an article in its magazine, by posted bulletins, by safety

meetings and by letters read and distributed individually to all employees in the roundhouse and machine shops, these employees were warned of the possibility of contracting dermatitis and of personal hygenic measures taken to avoid contracting such dermatitis. Dr. Schwartz made a three-day inspection of defendant's facilities in November 1951, and found them in good sanitary condition, with most of its basic recommendations already in force. He also examined 26 of the 36 individuals (out of 900 employees) who had reported cases of dermatitis in the past 5 years. Of these, 13 had no skin lesions at the time, 7 had nonoccupational diseases and 6 had active dermatitis of probable occupational origin, none severe enough to be disabled. He did not examine any of the plaintiffs.

These preventive measures were the result of investigation of the practices of other industries by both the operating and medical departments of the defendant following Crowley's initial outbreak of dermatitis. Prior to that time there were washroom facilities with individual wash basins, shower stalls and toilets available in the main shops, immediately adjacent to the "old roundhouse" where most of the roundhouse employees kept their clothes and equipment. In the roundhouse itself at first there was only running cold water. Late in 1949 both hot and cold running water were made available there. Outside the section of the roundhouse where plaintiffs worked, about 50 feet away, was a washroom with hot and cold water, washstands and showers. There was a conflict in the evidence as to who were permitted the use of this washroom. Kern testified that the reason the roundhouse employees did not like to use that washroom was that it was also used by yard and other employees, whom Criche referred to as "muckers." None of the plaintiffs used the washing facilities available to them prior to the outbreak of

▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄

their dermatitis. Crowley washed only at the noon hour. Kern did not wash with soap and water, but used kerosene and waste to clean his hands, a practice which Dr. Schwartz testified was more likely to cause dermatitis than any other. Criche used kerosene and oil to clean his hands, but he never washed himself at work. After the protective creams and ointment and the detergent and scrubbing agent were supplied, Crowley used the protective creams only two days, and used the detergent but not the scrubber. Kern used the protective creams only half a dozen times and he never used the corn-meal scrubber. Criche has never used these preventatives.

Dr. Cobin, defendant's dermatologist, testified that it had been known for 22 years that certain oils would produce dermatitis. When he saw Kern and Criche he knew they had been in contact with fuel oil. Dr. Meadows diagnosed the cases as contact dermatitis from fuel oil. It was not until January 1950, that the defendant took preventive steps to publicize the danger from working with diesel fuel oil. Dr. Bennett testified that since 1927 it was known that petroleum in certain concentrations could cause skin eruptions. He knew prior to 1947 that rubber gloves were proper prophylactics for exposure to fuel oils. Dr. Schwartz and others had written a book in 1939 containing a discussion on "Petroleum Dermatitis." It was known for many years and publicized by pamphlets issued by the United States Health Service that "petroleum was a hazard as a cause of dermatitis." Dr. Schwartz testified that in 1942 he knew that petroleum and its derivatives were a cause of dermatitis; that he had known that since 1930; that he had compiled or prepared publications printed by the United States Government with protective measures "involving exposure to petroleum and its derivatives"; and that he had published the first of

these in 1930 and in all there were 6 to 12 of such documents. At least 6 of such pamphlets written by Dr. Schwartz were published by the government in medical journals and in trade journals. In Dr. Schwartz's book, published in 1939, he wrote about "the hazard of exposure to petroleum oil and its derivatives in so far as dermatitis is concerned." Crowley testified that when he returned to work in February 1948, there were no bulletins posted with reference to the use óf diesel oil, nor were ointments or protective creams furnished to him. While the defendant urged cleanliness as an effective preventative against contact dermatitis from fuel oil, there were no washing facilities in the roundhouse prior to June 1949. Wash basins and showers were not installed until May 1950.

In *Urie v. Thompson*, 337 U. S. 163, the United States Supreme Court held that an occupational disease was an injury within the meaning of the Federal Employers' Liability Act. One of the points raised in that case was whether the trustee of the railroad knew or, by the exercise of ordinary care, should have known of the danger of silicosis arising from the conditions of employment. The court said that the Act does not define negligence, leaving that question to be determined by the common-law principles as established and applied in the federal courts; that the ruling in *Erie R. Co. v. Tompkins*, 304 U. S. 64, has no application; that what constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes; and that federal decisional law formulating and applying the concept governs. The court quoted with approval from *Sadowski v. Long Island R. Co.*, 292 N. Y. 448, 456, the statement that "ordinary care must be in proportion to the danger to be avoided and the consequences that

499

might reasonably be anticipated from the neglect." In the *Urie* case the court said further (186):

"In our view, when the employer's negligence impairs or destroys an employee's health by requiring him to work under conditions likely to bring about such harmful consequences, the injury to the employee is just as great when it follows, often inevitably, from a carrier's negligent course pursued over an extended period of time as when it comes with the suddenness of lightning."

 The question presented by defendant's motion for judgment notwithstanding the verdict is whether there is any evidence fairly tending to prove the cause of action. The court accepts as true, evidence in favor of the plaintiff and gives him the benefit of all favorable inferences that might reasonably be drawn therefrom. *Halloran v. Chicago & N. W. Ry. Co.,* 327 Ill. App. 217 (abst.); *O'Neal v. Caffarello,* 303 Ill. App. 574. In *Blair v. Baltimore & Ohio R. Co.,* 323 U. S. 600, the Federal Supreme Court said that to deprive railroad workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them, citing *Bailey v. Central Vermont Ry. Co.,* 319 U. S. 350, 354. In *Lavender v. Kurn,* 327 U. S. 645, the court said (653): "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." In *Ellis v. Union Pacific R. Co.,* 329 U. S. 649, the court said (653):

"The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury. . . . Whether those standards are satisfied is a federal question, the rights created being federal rights. . . .

500

The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury."

▉▉ The question at issue in this case was recently decided by the Second Circuit of the United States Court of Appeals in *Young v. Pennsylvania R. Co.*, 197 F.2d 727. There, an action by a dining-car waiter to recover damages for a contact dermatitis on his hands and arms alleged to have been caused by the use of three well-known products supplied by his employer for cleaning and sterilizing the dining-car equipment, resulted in a verdict in plaintiff's favor for $3,500. Under Rule 50 (b) of the Federal Rules of Civil Procedure the verdict was set aside and judgment entered in favor of the defendant. Plaintiff's medical evidence showed that these three products were irritants, and if used for a prolonged period would produce dermatitis. The Court of Appeals, in reversing the judgment and reinstating the verdict, said (727):

"From the evidence the jury could find that the plaintiff was exposed to the harmful effects of the above named irritants for long periods of time and that such exposure caused his injury. On the subject of negligence the jury was instructed that for the plaintiff to recover they must find that the use of the three cleansing agents created a risk of injury to the plaintiff which a reasonable person would have guarded against, and that the defendant did not take such measures to guard against that risk as would have been taken by a reasonably prudent man. Although there was no evidence that any other employee of the defendant had ever been similarly affected and representatives of the manufacturers of the cleaning products testified that they were widely used for the same purposes for which

the defendant used them and no such injury had ever occurred so far as they knew, we think a jury question was presented. The plaintiff testified that he visited the defendant's medical department at various times when the rash showed on his hands and the defendant's response to interrogatories acknowledged that the medical examiner of the railroad knew that the plaintiff claimed to be suffering from a dermatitis of undetermined cause. Although the proof was far from strong, we think it was error to set aside the verdict."

Defendant calls our attention to the fact that this was a *per curiam* opinion, one judge dissenting, and argues that the opinion is neither controlling nor persuasive. Defendant also calls attention to the rule that only decisions of the Federal Supreme Court are controlling under the federal statutes, citing *Lewis v. Braun,* 356 Ill. 467; *Kenna v. Calumet, Hammond & Southeastern R. Co.,* 206 Ill. App. 17, 26. Defendant exhibits as an appendix to its reply brief the briefs of both parties in the *Young* case and states that from the briefs it is apparent that the presentation was most inadequate. We observe that it was maintained that it "cannot be held that the furnishing of these products to the plaintiff for use by him in his work constituted negligence on the defendant's part unless the Railroad can be charged with notice that one or more of these products was likely to cause injury to the plaintiff or to someone doing the same or similar work," and that "there is no evidence on which to predicate such notice." In that brief counsel for the railroad, calling attention to the rule that liability arises from negligence and not from injury, said that the record of the case "is completely void of any evidence that any other dining car employee of the defendant, or for that matter, anyone else ever incurred contact dermatitis" through the use of the polish or other solutions used by the plaintiff.

In our opinion the briefs in the *Young* case adequately presented the question before us.

██ ██ ·In *Baumgartner v. Pennsylvania R. Co.,* 292 Pa. 106, 140 Atl. 622, a Federal Employers' Liability Act case, the court sustained a verdict for the plaintiff. In that case it was alleged that the decedent met his death by being fatally poisoned by monoxide gas arising from hot ashes in a pit from which the decedent was required to shovel the ashes. The court said (110):

". . . and the master is presumed to know the nature and qualities of the materials he places in the hands of his servants. In other words, he is presumed to have such knowledge of matters pertaining to his business as is possessed by those having special acquaintance with the subjects involved. . . . An employer is presumed to be familiar with the dangers, latent as well as patent, ordinarily accompanying the business in which he is engaged."

In *Harvey v. Welch,* 86 N. H. 72, 163 Atl. 417, an action to recover damages for injuries sustained by plaintiff in using an oxalic-acid solution in cleaning automobile radiators, the court said (73):

"The argument that the defendant had no actual knowledge as to the physiological effect of oxalic acid fumes, if well founded in fact, is not effective in law to absolve him from liability. Being under a positive duty to exercise care for the safety of his servant, he was bound to make reasonable inquiry for the purpose of informing himself of the natural consequences of using the material which he furnished. A master 'must take into account the properties of such substances as he employs for the purposes of his business and the operation of familiar physical laws upon these substances.' "

██ ██ In the instant case the jury was instructed that the burden was upon each of the plaintiffs to prove by a preponderance of the evidence that prior to the

time he contracted his dermatitis the defendant had actual knowledge of or, in the exercise of reasonable care, would have known that the plaintiff or any other employee similarly employed, was reasonably likely to contract a dermatitis from such contact that he might reasonably be expected to have with the oils used on or about the diesel locomotives. In our opinion, whether the defendant could or might have known of the dangers to the plaintiffs from the exposure to the diesel oils and chromates, was a question of fact for the jury. We have come to this determination after a careful reading of the transcript of the evidence, the briefs and the cases dealing with the proposition. It is significant that when Dr. Meadows first saw Crowley on December 22, 1947, he diagnosed his condition as contact dermatitis from diesel oils. He made a similar diagnosis as to Kern and Criche. There is evidence that defendant could or might have known that repeated or continual contact with diesel fuel and lubricating oils and with chromate solutions would cause dermatitis. There is evidence that notwithstanding this knowledge the defendant took no preventive measures until after plaintiffs had contracted dermatitis. We are of the opinion that the court was right in overruling defendant's motions for judgment notwithstanding the verdict.

 Defendant argues that the court erred in admitting the medical reports made out by Dr. Meadows and transmitted to Dr. Bennett because they are hearsay and therefore incompetent and inadmissible. The reports were offered to prove that the defendant knew, through its own doctors, that diesel fuel oil caused the dermatitis with which plaintiffs were afflicted. These reports were properly received in evidence as admissions against interest. Defendant as-

504

serts that the court erred in permitting questions concerning medical publications on dermatitis. Plaintiffs' counsel questioned the medical witnesses as to whether they were familiar with certain medical publications. There was no attempt made to show that any of the publications mentioned were in general circulation and usage. In *Ullrich v. Chicago City Ry. Co.*, 265 Ill. 338, the court said (341):

"The law is well settled in this State that scientific books may not be admitted in evidence before a jury, and that such books cannot be read from to contradict an expert witness except where such expert assumes to base his opinion upon the work of a particular author, in which case that work may be read in evidence to contradict him."

We are of the opinion that the court erred in permitting questions concerning medical publications on dermatitis. Inasmuch as there is strong support in the record for the verdicts on the question of liability, we do not believe that the judgments should be reversed and the cause remanded for the error. Under all the circumstances we do not think that defendant was harmed by the admission of the evidence.

Finally, defendant urges that the verdicts are so excessive as to require a new trial in the interest of justice. We agree that the verdicts are excessive. Crowley lost only 46 days from work before he insisted upon returning to work in the roundhouse against the advice of all the doctors he had seen up to that time. His wage loss to that date was $575. He was warned that if he insisted upon his right to return to work in the roundhouse he did so not at the direction or insistence of defendant, but of his own accord. On February 19, 1948, he returned to the job in the roundhouse,

505

which he knew was the cause of his condition and persisted in working there despite the fact that there have been vacancies in the back shop upon which he could have bid successfully by virtue of his seniority. The folly of his course of conduct is made clear by contrasting his case with those of Kern and Criche. They transferred to jobs in the back shop. Kern, after transferring, lost only 13 days from work on account of his dermatitis in 2½ years. At the time of the trial Kern's and Criche's dermatitis was mild and in the opinion of Dr. Robin was not permanent and was curable. As the result of continuing to work in the roundhouse and failing to follow the preventive measures directed by the defendant, Crowley lost an additional 250 days or more from work on account of his dermatitis and in the opinion of Dr. Robin, because of the length of time and the frequency of exposure, his condition is now permanent. Crowley's wage loss was somewhere between $4,000 and $5,000. His only out-of-pocket expense was about $200. Section 53, 45, USCA, provides that the fact that an employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. We are satisfied that when Crowley knowingly remained in contact with the source of his occupational disease and failed to use the means provided for protection against the hazards, he was guilty of contributory negligence as a matter of law. The record does not support a verdict for $42,800. Therefore, the judgment of the superior court of Cook county is affirmed as to John Crowley on the filing of a remittitur by him in the sum of $22,800 in the office of the clerk of this court within 10 days; otherwise, the judgment as to that plaintiff is reversed and the cause re-

manded to the superior court for further proceedings consonant with this opinion.

 Following the initial outbreak of his dermatitis, Kern lost 90 days from work. Later he lost 13 more days. His total wage loss on account of his dermatitis is approximately $1,500. Criche lost 83 days from work following the initial outbreak of his dermatitis. His subsequent wage loss, including the time lost on account of an accidental injury to his right hand, was about 50 days. His entire wage loss is approximately $2,000. Dr. Robin, testifying for plaintiffs, had no opinion whether Kern's condition which was "fairly mild at the time of trial," or Criche's condition which was "approaching normality," was permanent or not. He thought that if they would each avoid further contact with the irritating substances, their condition might be entirely cured. Under the testimony there can be no award of damages for either of these men on the theory of permanency of their injuries. There was no evidence of any monetary loss to either Kern or Criche other than their wage loss. We think that the verdicts of $28,900 and $19,500 in favor of these two plaintiffs are excessive. The verdicts in favor of Crowley and Criche were more than ten times their monetary damage and Kern's was more than twenty times his loss. The judgment of the superior court of Cook county is affirmed as to Charles Kern on the filing of a remittitur by him in the sum of $18,900 in the office of the clerk of this court within 10 days; otherwise, the judgment as to him is reversed and the cause remanded with directions to proceed in a manner consonant with the views expressed. The judgment of the superior court of Cook county is affirmed as to Richard T. Criche on the filing of a remittitur in the sum of $9,500 in the office of the clerk of this court within 10 days; otherwise, the judgment is reversed and the

cause remanded with directions to proceed in a manner consonant with the views expressed in this opinion.

*Judgments affirmed with remittiturs: otherwise, judgments reversed and causes remanded with directions.*

NIEMEYER, P. J. and FRIEND, J., concur.