Leo Joseph WHITE, Plaintiff-Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a corporation, Defendant-Appellant.

No. 36827.

Missouri Court of Appeals, St. Louis District, Division One.

May 4, 1976.

Motion for Rehearing or to Modify Opinion or Transfer Denied June 15, 1976.

Application to Transfer Denied Sept. 13, 1976.

Gerald D. Morris, St. Louis, for defendant-appellant.

Jo B. Gardner, Inc., Monett, for plaintiff-respondent.

McMILLIAN, Judge.

This is an appeal from a jury verdict and judgment of $45,000 in favor of plaintiff-respondent in a suit under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 (hereinafter referred to as FELA). For the reasons discussed below, we reverse and remand for a new trial.

The plaintiff herein is Leo J. White, a resident of Monett, Missouri. He started to work for the defendant, St. Louis-San Francisco Railway Company (hereinafter referred to as Frisco) in 1923. He was promoted to engineer in 1943. He worked as an engineer until November 25, 1953, when he was held out of service by Frisco's medical director because it was discovered that he had syphilis in an advanced stage. He returned to work in 1965 and worked for three (3) years operating switch engines in the Frisco yards at Ft. Smith, Arkansas. Thereafter, during his last three years of active service with the railroad, he was an engineer on defendant's local trains between Monett, Missouri and Tulsa, Oklahoma. On May 24, 1971, at approximately sixty-seven (67) years of age, he ceased active service for Frisco. At that time, he was senior engineer in his division of the railroad. The Union Agreement would have forced his retirement at age seventy (70).

The Monett-Tulsa run is 144 miles long. There are upwards of thirty (30) points along the line that require switching work by the local train. During switching operations, the engineer has to repeatedly lean out the window to see signals from the ground. A trip time of fourteen hours is not unusual. Engineers on this run work six days a week.

To power the local trains on the Monett-Tulsa run, defendant used locomotives of the type known as GP–7's, general purpose diesel locomotives suitable for either switching or road work. Like all railroad locomotives, the GP–7's are constructed so that the engineer's seat, controls and working area are located on the right-hand side of the cab. The distance between the engineer's seat and the bulkhead immediately to

the right of the engineer is five (5) inches. Built into this bulkhead is a window frame. The bottom part of the window frame has a steel channel along which two windowpanes slide horizontally in opposite directions. This steel channel is about six feet long, two inches high, and one-half inch wide. It is so situated that, when an engineer leans out the window, his side and back come in contact with its inside edge, which is moulded into the shape of a half circle about one-fourth to one-half inch in diameter.

When the GP–7 locomotives were delivered to defendant in the early 50's, each was equipped with a pad, or armrest, made of two-inch foam rubber covered with imitation leather. These pads were fixed by hinges to the inside of the bulkhead. So long as the windows were open, these pads could be laid across the rounded portion of the channel for the full length of the window frame. With this type pad in place, when an engineer leaned out the window, his body contacted only the padding and did not come in contact with the rounded steel channel or any portion of the bottom of the window frame. When not in use, the pad could be folded back so that it hung by the hinges inside the cab and the window could be closed. This type pad was referred to throughout the trial as the "foldover" or "flopover" pad.

In about 1960, locomotive manufacturers discontinued the use of the "flopover" pad and replaced it with what was referred to during the trial as the "rigid" type pad. These were long pads, fixed permanently to the outside of the cab bulkhead approximately even with the bottom of the window frame, which did not interfere with the opening and closing of the window. They formed a more or less padded armrest for the engineer as he leaned out the window— but did not afford any direct protection at the point where the engineer's body contacted the rounded window channel as he leaned out.

As the original "flopover" pads on the GP–7's wore out and became unusable, defendant replaced them with the new "rigid" type pads then being manufactured.

As the changeover of pads took place, a number of engineers operating GP–7's found that prolonged exposure to the moulded steel window channel resulted in discomfort. Some of them, including plaintiff, complained of inadequate padding on work forms they were required to fill out at the end of each run. Some, including plaintiff, went so far as to take the matter up with the local chairman of their union, who, in turn, took the matter up with the appropriate officials of the railroad. Although these complaints referred only to discomfort, not harm or injury, all of the locomotives which were called to defendant's attention were fixed. However, engineers were not always assigned to the same locomotive; and, if the assigned locomotive was not equipped with a "flopover" pad, the engineer could not refuse to go on the run.

Most of the GP–7 engineers whose runs demanded that they lean out the window a considerable amount of time coped with the situation by obtaining and carrying their own custom made pads, which they placed across the channel and window frame. These shared one drawback with the "flopover" type; they had to be moved before the window could be closed. Although the railroad issued no orders that the engineers had to use supplemental custom pads, it provided such a pad to any engineer who wanted one. Plaintiff had discussed getting such a pad with the foreman at Tulsa but never got it. Plaintiff, however, had tried a supplemental pad of his own making and discontinued its use because he found it inconvenient.

There is no evidence that, at any time before he left active service, plaintiff made it known to the railroad that he thought he was injured. The fact, however, that plaintiff was walking with the aid of a cane came to the attention of his supervisor, Mr. Richardson. Since he was concerned about the safety of plaintiff's operating locomotives, if he found it necessary to walk with a cane, Mr. Richardson set into motion the administrative procedure which resulted in plaintiff's physical examination. Plaintiff was notified on May 24, 1971, to report to

the Glass-Nelson Clinic, which handled Frisco's medical problems in the Tulsa area, for a physical examination.

Meanwhile, on that same day, May 24, 1971, plaintiff independently came to the conclusion that he was disabled by his back problem. His decision was brought about by the circumstance that his last six days of service, the last three round trips between Monett and Tulsa, were in GP-7 locomotives which had either inadequate padding or no padding at all.

On May 25, 1971, plaintiff presented himself at the clinic and was examined by Dr. Phelps. The examination revealed that plaintiff's musculo-skeletal system was more or less normal but that he had high blood pressure. This was reported to Frisco's Chief Surgeon, Dr. Hollo, who advised plaintiff to see a private physician and recommended that he be placed on a 90-day leave of absence because of his high blood pressure. This was done. Plaintiff saw Dr. Hollo in person in St. Louis on September 23, 1971, at which time he complained about the steel window channel and his back. This was the first time that plaintiff advised defendant that he had a back injury. Dr. Hollo recommended another 90-day leave so that plaintiff could get treatment for his high blood pressure and diabetes.

On October 11, 1971, plaintiff started seeing Dr. Murphy, D.O., of Monett. Dr. Murphy diagnosed plaintiff as having three distinct health problems: anemia, a thoracic-lumbar-rib strain, and nephrosis, a mild irritation of the kidneys. In October, 1971, Dr. Murphy advised Dr. Hollo by letter that plaintiff was able to return to work. However, Dr. Murphy never responded to Dr. Hollo's requests for additional information.

Finally, in December of 1971, Dr. Hollo received an unsolicited report from a Dr. Glass in Monett, who had no connection with either Frisco or the Glass-Nelson Clinic, which indicated that plaintiff was on three kinds of medicine for high blood pressure. Since this medicine could cause side effects making it unsafe for plaintiff to operate a locomotive, he was continued on leave of absence.

On June 11, 1973, plaintiff filed suit against Frisco under the provisions of the FELA. The petition alleged that plaintiff had been permanently disabled by defendant's negligence in failing to furnish a reasonably safe place to work. Specifically, plaintiff claimed that his back, kidneys and surrounding areas were injured because he had to lean out the cab window in such a way that said areas were subjected to repeated jarring without adequate protective padding. He claimed that he had been damaged in the amount of $250,000.

Happenings at the trial or other particular aspects of the evidence will be mentioned hereafter under the points to which they pertain.

On appeal, defendant raises five points. First, it contends that plaintiff failed to make a case for the jury as to negligence because the harm was not foreseeable and, therefore, that the trial court erred in failing to sustain defendant's motion for a directed verdict at the close of all the evidence. Second, it contends that the trial court erred in holding as a matter of law there was no issue of contributory negligence and thus refusing Instructions A and B which submitted the issues of contributory negligence and mitigation of damages. Third, it contends that the trial court erred in verdict-directing Instruction MAI 24.01, instead of MAI 17.01; or, if MAI 24.01 was the correct Instruction, its submission was erroneous because its form was altered so as to set apart and emphasize the alleged negligent act and because it failed to include the paragraph submitting foreseeability to the jury. Fourth, it contends that statements of plaintiff's counsel in opening and closing argument that defendant thought more of machines than men and that plaintiff was not getting a pension and had been zilched were prejudicial; and, therefore, that the court erred in overruling defendant's objections and requests for a mistrial. Fifth, it contends that the verdict is so excessive as to necessitate a new trial or, in the alternative, the verdict is not in accord with the rule of uniformity so that a remittitur should be ordered.

Although we find that plaintiff did make a case for the jury on negligence, we reverse on the contributory negligence issue and remand for a new trial. The other issues need not be resolved as they may not recur at the new trial. *McCaffrey v. Estate of Clarence Brennan,* 533 S.W.2d 264, 1976 (Mo.App.).

 Defendant's first contention is that, at the close of plaintiff's evidence, the trial court should have granted defendant's motion for a directed verdict. Defendant asserts that plaintiff did not make a case in negligence because he failed to show by substantial evidence or reasonable inferences that defendant, in the exercise of ordinary care, should have known that the absence of padding was a condition which was likely to cause injury to plaintiff. In short, defendant asks that the issue be taken from the jury. The intention of Congress, however, is that railroad employees have the right to a jury determination of their cases under the FELA. *Rogers v. Missouri Pacific RR Co.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Further, little evidence is necessary to create a jury question on negligence. *Stinson v. Atlantic Coast Line RR Co.,* 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93 (1957); *Wilmoth v. Chicago, Rock Island and Pacific RR Co.,* 486 S.W.2d 631 (Mo. 1972). Only when there is a complete absence of facts to support negligence can the case be taken from the jury. *Adams v. Atchison, Topeka and Santa Fe Ry. Co.,* 280 S.W.2d 84 (Mo.1955). Judicial review is confined to the reasonableness of the jury finding; the court cannot reweigh the evidence merely because the jury could have drawn different inferences or because the court feels that other results are more reasonable. *Sentilles v. Inter-Caribbean Shipping Corp.,* 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959); *Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944).

 Liability under the FELA is founded on the concept of negligence as that term has been defined by the Federal courts. *Copeland v. St. Louis-San Francisco Ry. Co.,* 291 F.2d 119 (10th Cir. 1961).

The federal decisions have held that foreseeability of harm is an essential ingredient of FELA negligence. E. g., *Brady v. Southern Ry. Co.,* 320 U.S. 476, 483, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Padgett v. Southern Ry. Co.,* 396 F.2d 303, 306 (6th Cir. 1968) and *Wolfe v. Henwood,* 162 F.2d 998, 100 (8th Cir. 1947). FELA negligence exists where the employer knew or should have known of the possibility of harm. *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). A protest or request by the employee may be evidence of the employer's negligence. *Wilmoth v. Chicago, Rock Island and Pacific RR Co.,* supra. Foreseeability is for the jury. *Hughes v. Terminal Railroad Ass'n of St. Louis,* 265 S.W.2d 273 (Mo. banc 1954).

 With these standards in mind, we move to the question of whether there was any substantial evidence in the record from which the jury could find that negligence by defendant played any part in producing plaintiff's injuries. The record is replete with evidence of protests by plaintiff and others about the lack of padding. This evidence would support a finding that defendant knew or should have known of the possibility of harm to plaintiff. Therefore, this evidence is sufficient to make a jury case on foreseeability. True, these protests referred to discomfort, not to harm or injury; but it is not our province to search the record for conflicting evidence in order to take the case away from the jury. *Tennant v. Peoria & Pekin Union Ry. Co.,* supra. The jury presumably weighed the conflicting evidence, and, on review, the jury's finding is reasonable. Consequently, we hold that the trial court properly denied defendant's motion for a directed verdict.

 Defendant's second contention is that defendant made a submissible case on contributory negligence. Although assumption of risk and contributory negligence have been completely abolished as defenses in FELA actions, 45 U.S.C.A. § 54, an employee's own negligence may diminish the amount of his recovery in proportion to the amount of his negligence, 45 U.S.C.A. § 53. *Tiller v. Atlantic Coast Line RR Co.,*

318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (1943). An employee is contributorily negligent when he fails to use those precautions for his own safety, which ordinary prudence requires. *Schlemmer v. Buffalo, Rochester and Pittsburgh Ry. Co.,* 220 U.S. 590, 596, 31 S.Ct. 561, 55 L.Ed. 596 (1911) and *Murray v. New York, New Haven & Hartford RR Co.,* 255 F.2d 42, 44 (2d Cir. 1958). The same standards as to proof and causation apply to both FELA plaintiffs and defendants. Plaintiff has the burden of proof in his cause, while the defendant has the burden of proof on plaintiff's contributory negligence. As to causation, plaintiff makes a jury case if his proof justifies, with reason, the conclusion that employer negligence played any part, even the slightest, in producing his injury. 45 U.S.C.A. § 51; *Rogers v. Missouri Pacific RR Co.,* supra. Likewise, if negligence on the part of plaintiff contributed in any way to causing his injury, a submissible jury case of mitigating negligence is made. *Ganotis v. New York Central RR Co.,* 342 F.2d 767 (6th Cir. 1965). Where the evidence is such that reasonable minds could draw different conclusions as to negligence and causation, the issues should be submitted to a jury. *Wilkerson v. McCarthy,* 336 U.S. 53, 63, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

■ There is no contributory negligence as a matter of law where an innocent cause concurs with the defendant's negligence in causing an injury. For example, in *Farmer v. Pennsylvania RR Co.,* 311 F.Supp. 1074 (W.D.Pa.1970), where plaintiff had lung damage from breathing chemical mist, the court properly refused an instruction that the jury should apportion the damages between defendant's negligence and plaintiff's preexisting tubercular condition.

At the opposite extreme, ". . . if the employer provides safety precautions of which the employee has failed to take advantage, then that employee is contributorily negligent as a matter of law." *Del Raso v. Elgin, Joliet & Eastern Ry. Co.,* 84 Ill. App.2d 344, 228 N.E.2d 470 (1967). For example, in *Crowley v. Elgin, Joliet & Eastern RR Co.,* 1 Ill.App.2d 481, 117 N.E.2d 843

(1954), the employee, who knew that his dermatitis was caused by contact with petroleum, returned to work against doctor's orders and failed to use the creams and ointments provided by the employer specifically for protection against such dermatitis, was contributorily negligent as a matter of law.

■ Clearly, the evidence in this case does not meet either of the above standards. We are not dealing with an innocent preexisting condition as in *Farmer,* supra; there is evidence which could indicate that plaintiff failed to take the reasonable precaution, taken by others, of procuring a personal pad. Unlike *Del Raso,* supra, plaintiff knew that such pads existed, such pads were not prohibitively expensive, and there is conflicting evidence on whether defendant furnished them. On the other hand, even if defendant would have furnished a personal pad on request, *Crowley,* supra, is distinguishable. There the employer not only furnished the means for protection but also went to great lengths to publicize their availability, so that plaintiff's failure to use them was undoubtedly intentional. Here, what precautions plaintiff should have taken, for his own safety, are in dispute.

However, defendant is not contending that plaintiff was contributorily negligent as a matter of law. Defendant claims only that it made a submissible case. Since the evidence is such that reasonable minds could differ, the issue should go to the jury. Therefore, we reverse and remand for a new trial.

■ Regarding defendant's third point, we do not reach the prejudicial effect of the instruction as given. However, we do note in passing that MAI 24.01 was the verdict-directing instruction, which is mandatory in FELA cases. MAI 17.01 submits the common-law standard of causation, whereas MAI 24.01 incorporates the more liberal statutory standard. However, unless there is a violation of a safety rule, the negligence instruction must require a finding of foreseeability. See *Adams v. Atchison, Topeka & Santa Fe Ry. Co.,* supra, at 92;

*Hughes v. Terminal RR Ass'n of St. Louis,* supra, at 280–281. This is especially significant since, as discussed under the first contention, this element is the crux of defendant's case. Therefore, on retrial, as provided by the "Notes on Use," the additional paragraph should be inserted submitting whether "defendant knew or by using ordinary care should have known of such condition, and that such condition was reasonably likely to cause substantial harm."

Similarly, on defendant's fourth point, we do not reach the prejudicial effect of these opening and closing arguments. However, on retrial, we caution plaintiff's counsel to confine himself to relevant evidence, *Gilmore v. Union Construction Co.,* 439 S.W.2d 763 (Mo.1969), and not to draw inferences from matters not in evidence, *Reese v. Illinois Terminal RR Co.,* 273 S.W.2d 217 (Mo. 1954).

For the above reasons, judgment is reversed and the cause remanded for a new trial.

WEIER, P. J., and RENDLEN, J., concur.