**A. T. RODERICK, Respondent,**

v.

**ST. LOUIS SOUTHWESTERN RAILWAY CO., a Corporation, Appellant.**

No. 45368.

Supreme Court of Missouri,

Division No. 1.

March 11, 1957.

Finley, Lucas & Arnold, Wilder Lucas, Joseph A. Murphy, St. Louis, for appellant.

Jo B. Gardner, Sam R. Gardner, Monett, for respondent.

HOLLINGSWORTH, Presiding Judge.

This is an action under the Federal Employers' Liability Act, Title 45 U.S.C.A. § 51, to recover damages in the sum of $91,024 for personal injuries resulting from dermatitis allegedly sustained by plaintiff through contact with sodium bichromate in a rust inhibitor used in the cooling system of diesel engines. The jury returned a verdict in favor of plaintiff for the sum of $45,000 and judgment was accordingly entered. Defendant's motion for new trial

was overruled on condition plaintiff remit the sum of $30,000, which he did. The original judgment was set aside and a new judgment was entered for $15,000. Defendant appealed, alleging error: (1) in instructing the jury that in assessing plaintiff's damages it could consider any permanent injuries sustained by him; (2) in permitting plaintiff's counsel, in argument, to advise the jury of plaintiff's life expectancy and to urge that expectancy as a basis of assessing damages for permanent injuries; (3) in attempting to correct by remittitur an excessive award predicated upon said erroneous instruction instead of granting a new trial; and (4) that the judgment was excessive after remittitur.

Plaintiff began his employment with defendant in May of 1941. Prior to that time and beginning in 1923, he had worked several years at each of the following jobs in the order stated: as a boilermaker apprentice, in a printing office, in construction work, and as a painter of road signs for the Arkansas Highway Commission. When he began his employment with defendant in 1941, he worked about a month in the bridge and building department and then transferred to the boiler shop, where he remained until November, 1951. At that time he voluntarily surrendered his seniority as a boilermaker and changed over to the electrical department as an electrician's helper in the diesel shops at Pine Bluff, Arkansas, where he has remained and at trial time continued to be employed.

Upon becoming an electrician's helper working on diesel engines and in the cleaning, repair and servicing thereof, plaintiff came into contact with greases, oils, solvents and, especially, a rust inhibitor referred to in the evidence as Nalco No. 38. It contained a solution of sodium bichromate in water. Chrome, of which sodium bichromate is a form, is an irritant of the skin and produces dermatitis in some persons after varying lengths of time of exposure, dependent upon the in-

dividual, the extent of contact and the use of preventive measures. Defendant had knowledge of the effects of chrome upon human skin from the time plaintiff entered its employ. The use of Nalco No. 38 was discontinued in October, 1953. Since that time no chrome-bearing rust inhibitor has been used.

Defendant does not on this appeal deny that plaintiff contracted dermatitis during the time he was at work upon and around the diesels nor does defendant deny that plaintiff made a submissible case of defendant's negligent failure to provide plaintiff with means to prevent Nalco from coming into harmful contact with his skin or to remove it from his skin in time to prevent any harmful result or to warn plaintiff of the danger of coming into contact with it or to furnish plaintiff with a reasonably safe place in which to work. It is only fair to state, however, that defendant did adduce substantial evidence tending to show its freedom from such negligence and that plaintiff's dermatitis, if the result of contact with Nalco 38, was caused in whole or in part by an individual allergy or hypersensitiveness to it or by reason of his negligent failure to seek other employment or to avoid letting Nalco come into contact with his skin after being fully advised of its harmful possibilities or to use the methods and agencies provided by defendant to remove it from his skin before it could have any harmful effect.

Further details of the evidence will be set forth as they become pertinent.

Instruction No. 12, given at the request of plaintiff, fixed the measure of any damages awarded plaintiff at such sum as would reasonably compensate him for all damages sustained to date and such as he was reasonably certain to sustain in the future. It then told the jury that in arriving at that sum it could consider (1) loss of earnings to date; (2) plaintiff's physical condition, past and present; and (3):

"You may also take into consideration such distinct permanent injuries, if any, as you find from the evidence that plaintiff has suffered as a direct result of such injury, if any."

The court refused plaintiff's request that the jury be further directed to consider the loss of future earnings in assessing any damages awarded.

■ Defendant insists that there was no substantial evidence upon which to predicate an award of damages for any permanent injury suffered by plaintiff. And, it is in this connection that defendant also predicates error in permitting plaintiff's counsel to refer in his closing argument to plaintiff's life expectancy. In considering these assignments, we review the evidence from the viewpoint most favorable to plaintiff. Boyd v. Terminal Railroad Association of St. Louis, Mo., 289 S.W.2d 33, 35.

■ To authorize recovery of damages for permanent injury, there must be evidence tending to show such fact with reasonable certainty. Absolute certainty is not required but conjecture, likelihood or even probability of permanency is not sufficient. Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328; Weiner v. St. Louis Public Service Co., Mo., 87 S.W.2d 191; State ex rel. Kansas City Public Service Co. v. Shain, 350 Mo. 316, 165 S.W.2d 428.

Plaintiff, as stated, began his work in the diesel shops on November 27, 1951. His work was on the night shift, tearing down and cleaning motors and generators. In the spring of 1953 he was transferred to the day shift. In July or August of 1953, he noticed pimples or blisters on his hands. They hurt and itched. The condition was treated for a week or two by local physicians without beneficial results and he went to the St. Louis Southwestern Railway Lines Trust Hospital in Texarkana. There, on September 28, 1953, at the direction of the chief surgeon, he was placed under the care of Dr. Raymond P. Hughes, a specialist in dermatology. Plaintiff remained at the hospital for several days. Dr. Hughes at that time told him, "You will never get well as long as you work there." Plaintiff thereafter returned for treatment some seventeen or eighteen times, never remaining at the hospital for more than five days on any visit and generally, it seems, not to exceed one or two days, until he returned in June, 1955, with a "flare-up" that caused him to remain at the hospital for more than a month. His hands would improve following his visits to the hospital and Dr. Hughes told him, "You can go back to work, providing you come back and forth to see me", which he did as directed. Plaintiff told Dr. Hughes that the soap furnished the workmen hurt his hands, and was told by the doctor not to use it. Plaintiff's hands "got so bad" he was transferred from the pit and put "on the engines that run in and out". His hands got better. He was told not to wear rubber gloves and thereupon began to wear cotton gloves, which he changed every two days. After the use of Nalco 38 was discontinued, plaintiff's contacts were with greases and oils in the cleaning of engines. He suffered at night. Water would run out from his fingernails and the nails on both hands have come off several times. His hands have hurt ever since he developed dermatitis. He is never completely free from pain. He had two years' seniority as an electrician's helper when he contracted dermatitis. He has continued his work because of his age and his belief that dermatitis made him unable to hold a job elsewhere. It is embarrassing to appear in public with his hands exposed or to go into people's homes and eat at the table with them. (Plaintiff at this point in his testimony exhibited his hands to the jury.) The dermatitis has spread to his wrists and forearms and to his feet and ankles. It also has appeared at times at his waistline.

The first time plaintiff ever saw any bulletin in regard to the use of preventive

measures was in March, 1954, after he had contracted dermatitis. A speech was made by Mr. Scott, his superior in authority, in May, 1955, about skin rash and keeping clean.

Plaintiff talked to Mr. Scott about a transfer after coming from the hospital. Mr. Scott told him that Mr. Carr, local union chairman, said that on account of plaintiff's seniority "they" could not take him out of the pit for more than a month, which was done, but at the end of the month "they" put him back in the pit, because the man who had seniority over him wanted his job back. Plaintiff never thereafter made inquiry as to other job openings with defendant; neither has defendant offered him any other job; nor has he ever refused to work wherever defendant directed him. The union arrangement requires any employee desiring to change to an available job to bid for it. In January, 1954, plaintiff took a 14-day vacation, dividing his time between the hospital and his home. His hands improved some. He has worked on the "power house job" for defendant for the last eight or nine months and his hands have improved, but they still break out. When he came back from the hospital the last time after a stay of two months, Dr. Hughes, following consultation with Dr. Hibbitts, told him to go back to work, saying, "You are as well as well could be."

Plaintiff has worked at an unchanged pay rate of $1.69½ per hour, $67.80 per 40-hour week before taxes, ever since he became an electrician's helper. In 1952, his first full year of employment at the diesel shops, his earnings before taxes were $3,539.02; in 1953, $3,502.47; in 1954, $3,524.34; and in 1955, January through August, $2,347.07. During the entire period of plaintiff's treatment from the inception of his dermatitis in July or August of 1953 until the time of trial he had lost only eleven working days from his job, a loss of earnings in the sum of $149.16. Hos-

pitalization and medical treatment have cost him nothing.

Dr. Lawrence K. Halpern, a duly qualified expert specializing in dermatology, first saw plaintiff about four days prior to the trial, at the request of plaintiff's counsel. Dr. Halpern testified: He obtained a full history of plaintiff and made a complete examination of his entire skin surface. His diagnosis was contact dermatitis, which began as a reaction to sodium bichromate. Chrome, of which sodium bichromate is a form, is a primary irritant, that is, a substance which when it makes contact with the human skin will cause the skin to break out if the concentration is great enough or the exposure is long enough. It is also a skin sensitizer, which means a substance that upon first contact with the skin will not cause irritation, but after a period of incubation and re-exposure, which may be any time between five days and several years, the skin will break out because the individual has become sensitive to it. During the period of incubation, certain changes occur in the skin which cause the reaction upon later exposure. There is also a condition known as polysensitivity or cross-sensitivity. The terms are synonymous. They may be explained by example: If an individual worked with many different chemicals and had no trouble with them for several years and then became sensitized, for instance, to a chromate (sodium bichromate), his skin thus sensitized becomes more vulnerable to breaking out from other chemicals that never before caused him trouble. It is, therefore, a reasonable medical certainty that if plaintiff, during the years of his painting, working in a printery, and in jobs where he came into contact with turpentine, solvents, greases and oils, even though these substances had not theretofore bothered him, it is very likely they will now do so. The great improvement in plaintiff during hospitalization and home visits over the weekend indicates sensitization. The longer the duration of the irritation the more chron-

ic it becomes and the less readily the skin returns to normal.

"Q. We are assuming, doctor, that he has had this now for over two years; you are assuming that to be true? A. I assume it is.

"Q. That entered into your judgment, does it not? A. Yes. I will state again—I say that a sensitivity existing as long as this man's—sensitivity to chrome, as long as this here, that sensitivity would, in my opinion, exist ten years from now—fifteen years from now. If I repeated a test, then, on a permanent basis, I would expect he would react positive to a patch type test.

"Q. Your opinion is, then, the sensitivity is permanent? A. It would be my opinion that it would be permanent."

The doctor also believed that plaintiff had developed a cross-sensitivity and it is his opinion that plaintiff should not be recommended for work in printing or where cleaning solvents are used or in the chemical industry. It is also the doctor's opinion that plaintiff will have difficulty with his skin "from here on out"; the degree of difficulty being dependent upon the type of work he does. If he engages in a dry job, the chances are that he would have very little difficulty, but there still is a chance of it.

On cross-examination, Dr. Halpern testified:

"Q. Now, doctor, I think you also made the statement to the jury that you felt that he has a permanent sensitivity at this time? A. To chromates.

"Q. You think it is permanent to chromates? A. I would say so.

"Q. You think it would be? A. Yes.

"Q. Would he be sensitive to other things besides chromates? A. Permanently?

"Q. Yes. A. That, I don't know, Mr. Lucas.

"Q. You don't know that? A. No."

Plaintiff offered in evidence the mortality tables as set forth in 58 C.J.S., p. 1212, insofar as they pertained to life expectancy. Defendant objected to their admission upon grounds there was no basis for admitting evidence of plaintiff's life expectancy because there was no evidence of permanent injury such as would adversely affect plaintiff's ability to engage in gainful employment and that permanent sensitivity to one substance, to wit: chrome, did not amount to a permanent disabling injury, citing the recent case of Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726. After an examination of the opinion in that case, the trial court sustained defendant's objection. Plaintiff thereupon proffered the table to show that plaintiff's life expectancy was 22.12 years, which proffer was denied for the reasons above stated. However, during argument of the cause by plaintiff's counsel, the following occurred:

"What is he worth today? First of all, he has had that for some seven hundred and thirty days—and, what about the future? The man is forty-nine years old—he will live twenty-six (sic) more years, seventy-three hundred more days in the future that man will carry those hands—

"Mr. Lucas: (interrupting) There is no evidence of that in the record about the length of time. As to life expectancy, there is no evidence along that line—

"The Court: (interrupting) Overruled. Proceed.

"Mr. Sam Gardner: Seventy-three hundred more days, after the seven hundred and thirty days—that will total over eight thousand days from the day that it started out. How much is it worth a day? * * *"

Defendant's evidence was that plaintiff's dermatitis was not permanent; that he was undergoing a "hardening" process which in time would render him immune to chromates and the dermatitis would clear up, "providing he continues to work right along; that is necessary".

Defendant urges our recent case of Evinger v. Thompson, 364 Mo. 658, 265 S.W. 2d 726, 734, as authority for its assertion that there was no substantial evidence of permanent injury resulting to plaintiff in the instant case from contact with Nalco No. 38. Upon hurried examination, it may seem that the Evinger case so holds, and it is obvious that the trial court, upon first consideration of it, so understood it. But, careful study of the opinion in that case and an examination of the transcript and briefs filed in this court upon its appeal reveal that it holds to the contrary of defendant's contention. The measure of damage instruction does not mention "permanent injury" as such; the question of "permanent injury" arises only incidentally in determining whether the verdict and judgment for $35,000 was excessive. There is no mention of polysensitivity or cross-sensitivity in the briefs or the instructions in that case. In discussing the question of excessiveness of the verdict, the writer of the opinion deals with two types of personal injuries: first, dermatitis, as such, which, as a matter of common knowledge, means a breaking out or inflammation of the skin, and, second, an acquired sensitivity of the skin due to exposure to chrome that impaired plaintiff's future earning capacity. In speaking of these two types of injury, we said, 265 S.W.2d loc.cit. 734–735:

"He had dermatitis on his arms, legs and neck at the time of the trial. The itching caused much discomfort and loss of sleep. * * * When he gets warm and sweats the dermatitis still breaks out, his hands swell and his face gets sore, sometimes so he cannot wear his glasses. Strangers shun him because of his skin condition. However, none of his doctors would say that his condition was permanent, although they were of the opinion it would take a long time to clear up and did not know how long. They did say he could never be in contact with chrome substances without breaking out. * *

"We think the verdict was excessive because we cannot find that plaintiff had substantial evidence of total disability or that his *dermatitis* would be permanent. It does seem obvious that he could not continue the diesel work he had been doing, even with the new protective measures, because of *the sensitivity to chrome which he has now developed*. Thus his earning capacity has been impaired * * *." (Emphasis present writer's.)

Nowhere in the opinion does the court say or even intimate that a sensitivity to chrome, acquired through negligence of an employer, such as will impair an employee's earning capacity, does not constitute an injury for which he may recover damages. The opinion holds directly to the contrary. It further holds that the evidence shows the injury resulting in sensitivity is permanent but does not show that the dermatitis is necessarily permanent. Obviously, it was correct in so holding.

In the instant case, several things are made clear by plaintiff's evidence: (1) At trial time plaintiff was and had been for more than two years afflicted with a recurring dermatitis, which may or may not clear up if he stays completely away from chromates; (2) he has developed permanent sensitivity to chromates, which renders him permanently unfit for employment where he may come into contact with them; (3) he has and for an indefinite time in the future will have a polysensitivity to such things as oils, greases, solvents, etc., thereby further impairing his ability to earn money for an indefinite period of time; and (4) there is no evidence that the polysensitivity is permanent.

We hold that there was evidence justifying the submission of an award of

damages for a distinctive permanent injury sustained by plaintiff, to wit: an acquired sensitivity to chromates that will cause a recurrence of dermatitis if he should come into contact with them, thereby reducing or impairing his earning capacity pro tanto. If defendant desired that the instruction be clarified so as to specifically limit plaintiff's recovery for permanent injuries to a permanent sensitivity to chromates, it should have sought an instruction to that effect. Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, 500–501.

■ In view of our conclusion that there was substantial evidence of permanent impairment of plaintiff's earning capacity, it follows as a matter of course that the trial court erred in refusing plaintiff's proffer of the mortality tables, insofar as they showed plaintiff's life expectancy. Hohlstein v. St. Louis Roofing Co., 328 Mo. 899, 42 S.W.2d 573, 576; Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877, 883. The usual procedure is to admit the statistic of plaintiff's life expectancy in evidence, following which the court, at the request of either party, gives the jury such instructions as to the consideration to be given life expectancy as is proper. Peters v. Kansas City Rys. Co., 204 Mo.App. 197, 224 S.W. 25, 28. But the error of the court in not admitting plaintiff's life expectancy into evidence was invited by defendant, which would seem to preclude serious consideration of an assignment of error to the overruling of its later objection when plaintiff's life expectancy was mentioned in argument. Of course, the erroneous statement as to the length of such expectancy should have been corrected, but no objection on that ground was made. In any event, for reasons that will appear, the matter may be passed without further consideration.

And, in connection with its contention that there was no substantial evidence that plaintiff suffered any permanent injury, defendant also says it was error to overrule its motion for new trial conditioned upon plaintiff's remitting $30,000 of the $45,000 verdict. The argument is that the verdict was returned on the basis of error in the instruction submitting a finding of permanent injury and that such a verdict cannot be cured by remittitur. Our conclusion that there was substantial evidence upon which to predicate a finding of permanent injury to plaintiff, in effect, has also ruled this point against defendant.

■ Finally, defendant contends that "even were there no other error in the case the judgment of $15,000 after remittitur of $30,000 is still so excessive, that the trial court erred in not ordering a larger remittitur" and that such error may be cured by a further remittitur. Where, as in this case, the trial court has ruled a motion for new trial upon the amount of the verdict, which we have said amounts to a ruling upon the weight of the evidence, this court, whether on appeal of plaintiff or defendant, will look to see whether the evidence, viewed in the light most favorable to the ruling, affords reasonable and substantial support of that ruling. If it does, then it must be sustained. Wilhelm v. Haemmerle, Mo., 262 S.W.2d 609, 612–613; Sanders v. Illinois Central Railroad Co., 364 Mo. 1010, 270 S.W.2d 731, 738. In determining whether the evidence affords reasonable and substantial support of the judgment rendered herein, we may again say, as we said in Brown v. Payne, Mo., 264 S.W.2d 341, 348: "Admittedly there is no precise formula for gauging whether a verdict is excessive, each case depends upon its own facts. Consideration is given the nature and extent of the injuries and losses, diminished earning capacity, changing economic factors and the compensation awarded and approved in cases of similar or fairly comparable injuries. The nature, extent and permanency of the injuries are the paramount factors and the ultimate test of excessiveness or of inadequacy of award is what will fairly and reasonably compensate the plaintiff for her injuries."

**430**

At the outset, defendant says that plaintiff's evidence convicts him of contributory negligence as a matter of law in that shortly after he contracted dermatitis he was told by Dr. Hughes that he would never get well as long as he worked at his present job and that, after obtaining one temporary transfer for a period of one month, he never thereafter made any attempt to change over to any other job or craft; and that when the evidence establishes contributory negligence of the plaintiff as a matter of law, this court, in considering the question of excessiveness of the judgment, should determine whether plaintiff's damages have been proportionately diminished. In support of that position, defendant cites Scneder v. Wabash Railroad Co., Mo., 272 S.W.2d 198, 207, wherein it is said: "* * * but in cases arising under the Federal Employers' Liability Act, the reviewing court must further find whether any contributory negligence pleaded was established as a matter of law, and if so, whether the damages determined have properly been diminished thereby." The cases cited by the writer of that opinion do not support the statement above quoted; but defendant also cites the case of Crowley v. Elgin, Joliet & Eastern R. Co., 1 Ill.App.2d 481, 117 N.E. 2d 843, which does support the statement in the Scneder case. Plaintiff strenuously challenges both cases upon the ground that contributory negligence of plaintiff, even though it be established as a matter of law, is a matter of concern to the court only in determining whether such negligence is the sole cause of plaintiff's injuries, citing New York Central R. Co. v. Marcone, 281 U.S. 345, 350, 50 S.Ct. 294, 74 L.Ed. 892, 896.

■ Both the Scneder case and the Crowley case seem to go further than any other case that has come to our attention, but we need not here approve or criticise either of them for the reason that we have no hesitancy in holding that the evidence most favorable to plaintiff does not convict him of contributory negligence as a

matter of law. Defendant's argument overlooks plaintiff's testimony that after his hands and the other affected parts of his body had improved under treatment, Dr. Hughes told him he could go back to work if he would return for treatment as the doctor directed, which he did. The argument also overlooks the fact that plaintiff readily accepted the only transfer (a temporary one of one month) that was offered him and that defendant never at any time offered him any other job. Indeed, the evidence would warrant the jury in finding that defendant's position was that if plaintiff should continue with his work he would become "hardened" and thus immune to any further affliction or disability by reason of his present sensitivity.

■ We need not again detail the extent of plaintiff's injuries. He was 49 years old at trial time and had an eighth grade education. His only skills were that of a boilermaker, for which there seems to be little demand in the railroad business, and two years experience and seniority as an electrician's helper. Obviously, these facts, when considered in connection with the further evidence that he can never work around chromates and that for an indefinite (and, inferably, long) time he will be unfit for work at any job where he would come into contact with greases, oils, solvents, etc. The judge who saw his hands and heard all of the evidence was in a far better position than this court accurately to assess his damages. Both defendant and plaintiff have cited the Evinger case, 364 Mo. 658, 265 S.W.2d 726, in support of their respective contentions. In that case, plaintiff had verdict and judgment for $35,000. Plaintiff's age, education, skills, earning capacity and injuries were strikingly parallel to those of plaintiff in the instant case. In the Evinger case, plaintiff had lost earnings in excess of $12,000, but the evidence also showed that such loss could have been almost entirely avoided if he had not perversely refused to accept another job with defendant which defendant had offered him and which

had the approval of his union. In the instant case, plaintiff had lost only $149.16 in earnings.

A majority of this court held that plaintiff in the Evinger case had failed to act as an ordinarily prudent man in refusing to minimize his loss of earnings by accepting employment offered him by his employer and that $10,000 should be remitted, leaving his recovery at $25,000. Two of the judges thought $20,000 should be remitted, leaving his recovery at $15,000, which is the amount awarded by the trial court in the instant case. The judgment is definitely ample but we are not convinced that the court abused its discretion in rendering judgment for that sum.

The judgment is affirmed.

All concur.