David MORRIS, a minor, by his next friend,
Mary Cahoon, Appellant,

v.

ISRAEL BROTHERS, INC., a corporation,
Respondent,
and
Sorkis J. Webbe, Administrator of the
Estate of James H. Blevins,
Deceased, Defendant.

No. 57169.

Supreme Court of Missouri,
Division No. 2.

May 13, 1974.

Motion for Rehearing or to Transfer to Court
En Banc Denied June 10, 1974.

Thomas C. Hullverson, Hullverson, Hullverson & Frank, Gordon W. Neilson, St. Louis, for appellant; Burton H. Shostak, St. Louis, of counsel.

Bernard C. Brinker and Carter, Brinker & Doyen, Clayton, for defendant-respondent, Israel Brothers, Inc.

HOUSER, Commissioner.

Fourteen-year-old David Morris was injured when an automobile driven by James Blevins, in which David Morris was riding as a guest passenger, left Highway

21 in St. Louis County at night and ran over an embankment as it approached a barricade erected by Israel Brothers, Inc., a highway contractor engaged in rebuilding the highway. Blevins was killed in the accident. David Morris, pro ami, sued Blevins' administrator and Israel Brothers, Inc. for damages. The trial jury returned a verdict for plaintiff and against both defendants for $480,966. In posttrial procedure the circuit court overruled Israel Brothers, Inc.'s motion for judgment in accordance with its motion for a directed verdict and sustained its motion for new trial for error in giving Instruction No. 2. The court further found the verdict excessive and ordered that if plaintiff would remit the sum of $200,000 from the verdict and judgment the motion of Israel Brothers, Inc. would be overruled; "otherwise sustained on the ground that the verdict is excessive. Said order of remittitur to be effective in the event the Court's ruling granting a new trial be reversed. In event of such remittitur new judgment shall be in sum of $280.966.00." Plaintiff filed a notice of appeal, prior to January 1, 1972. Israel Brothers, Inc. (herinafter "the contractor") filed a brief and argued the case on appeal. The administrator filed no brief and made no appearance.

The issues on this appeal are: Did plaintiff make a submissible case on negligence and causation? Was the verdict-directing Instruction No. 2 erroneous? Was the verdict excessive; and should the court have ordered a $200,000 remittitur? Our opinion will develop our conclusions that plaintiff made a submissible case both on negligence and causation; that Instruction No. 2 was not erroneous; that the court's action in ordering a $200,000 remittitur did not constitute an abuse of discretion, and that the court's order of a new trial on all issues upon failure of plaintiff to make a remittitur should be affirmed.

The accident occurred after dark, between 9 and 10 o'clock p. m. on August 12, 1967. Blevins occupied the driver's seat. Plaintiff's sister Susan was seated in the right front seat. (She was killed in the accident.) Plaintiff was sitting in the rear seat.

## The Charge of Negligence

Plaintiff pleaded that the contractor negligently failed and omitted to erect lights to warn motorists; failed and omitted to provide adequate lighting at the location where the contractor caused a detour in the traffic, where Kempf Road intersected Highway 21 (about two miles south of Highway 61 in St. Louis County).

## Submissible Case?

Plaintiff made a submissible case on the charge of negligence by his own personal testimony; that of his witnesses Robert Marshall, Carol Gowert and Reid Braswell, and the contractor's answers to interrogatories.

The pertinent testimony given by plaintiff personally was as follows: Plaintiff was sitting on the edge of the back seat, holding onto the back of the front seat, looking over the front seat, where he could see and did observe the speedometer. Within the distance of a block of the collision the car was traveling 40–45 m. p. h. Plaintiff looked up and saw barrels "across the road". Asked "Did you see a barricade or sign or barrels in the roadway?" he answered "Yes, sir", and later testified that all he saw was "just the barrels" across the road, 60–70 feet away. When plaintiff saw the barrels he yelled at Blevins and they "went off", "rolled off", "turned off", the road and hit an embankment, still traveling at 40–45 m. p. h. There was no change in the speed of the car. On the vital question of lights plaintiff testified as follows: "Q What else did you see, if anything, across the road there except the barrels? A Just the barrels. Q Did you see any blinking or flashing lights? A No, sir. Q Were you looking for any? A I was looking for some when I seen barrels across the road. Q Pardon? A I looked but I didn't see

**440**

any. * * * Q * * * [T]he barrels, * * * you said you saw no lights on them or around them? Is that true? A Yes."

Robert Marshall, who lived roughly two miles from the place where the accident occurred and was familiar with the intersection, testified as follows: He traveled over Highway 21 at the Kempf Road intersection two, three, possibly four times a week, both during the day and during the evening, during the first two weeks in August, 1967. There was a barricade across Highway 21. He came up to that barricade in the nighttime at least once a week in the first two weeks of August. Asked whether on these occasions there were any lights (any highway warning lights or flashers consisting of blinking yellow or amber light or a potted type with a flame or a red-type flasher) leading up to the point of this barricade coming from south to north, he answered "[i]f there were any I didn't see them. They could have been there and out but there was nothing showing." He described the barricade ("a wooden slatted affair, roughly four feet high and almost the width of the highway, * * * [n]o particular design, just a bunch of slats nailed together * * * a standard type barrier to keep somebody from running into the dirt embankment or at least let you know you were approaching it"). He saw barrels along the edge of the highway but could not remember any signs posted; there were no markers. The barricade was illuminated with a reflective type of paint. Asked on cross-examination whether he "ever saw flashing or blinking lights in front of that barricade" he answered, "At this time, right here, if you ask me that I can't remember if I did and I'm pretty sure I did not. * * * To the best of my knowledge. I can't recall seeing any working lights." He thought the dust and dirt would affect the reflector paint on the barricade, but would not totally cover it. His memory refreshed by showing him a statement he had signed shortly after the accident, Marshall testified " * * * I could not remember about when I was asked if there were any flashing lights and to the best of my knowledge I recall there was flashing lights but they were not working the majority of the times. * * *." (The statement said there were some blinking lights out there but they were not working.) He would not deny that blinking lights were working on the night of the accident because he was not there that night, but he testified, "I'd say the majority of the times I went by while I was taking my boys back and forth from ball games, the majority of the times there were no lights working."

Carol Gowert, who lived a city block from the intersection and was familiar with the construction going on at the intersection, testified as follows: She passed the intersection at least once and normally two or three times a day, and in the evening after dark. She described the barricade. Asked whether in the week or ten days prior to August 12, 1967 "there were any lights, in the nature of yellow caution lights or blinkers or flashers or pots"; whether she was familiar with whether "there were any of those lights out there in the evening which would be operating", to which she answered "There weren't * * * [a]ny flashers or what you call them, smoke pots, or anything." Quoting from the transcript: "Q Do you recall seeing any yellow blinking or flashing lights? A No, I don't. No. There were some. They had all their equipment in the part that was not opened yet. Q Do you know whether or not there were any lights leading up to this barricade— A There weren't, no. Q —at that time and under those circumstances? A No, there weren't." On cross-examination this took place: "Q When you got about five feet from Kempf Road do you remember a diamond shaped sign showing an arrow going to the right and two amber flashing lights on a bar on this sign? A No, I don't. Q Do you deny it was there? A Well, I was in and out of there two, three times a day and I don't recall seeing it. * * * Q Ma'm did you ever see in front of this barricade across Highway 21 a series of amber battery op-

erated flashing lights from the two weeks in August prior to August Twelfth until the barricade was removed? A No. Q You never saw them there? A No. Q Do you deny they were present? A Yes, I do."

Reid Braswell, who lived roughly a mile from the intersection in question, traveled back and forth every day from his home to his restaurant in St. Louis. After referring to the barrels and a "saw horse affair" at the intersection, he testified as follows: He went by there after dark on the nights of August 8, 9, 10, 11, and 12. He would not leave his place of business until 9:30 or 10 p. m. "Q In the, let's say, four or five days before August 12th, leading up to August 12th, did you observe any yellow lights or flashers or lighting at all leading up to this saw horse affair that you have told us about? A I saw no lights. Q Do you recall whether or not there were any blinking lights at all on the barricade up there? A I didn't observe any lights." Asked if he remembered a sign with an arrow pointing to the right, with two amber flashing lights on a bar beneath it, he answered, "If it was dark I think I would have seen the amber lights." He would not deny that there was a sign with blinking lights on a sign with an arrow, but he did not remember seeing it. Further: "Q Sir, when you went by there at night will you tell the jury whether or not, in front or ahead of this wooden barricade and whatever else you saw, whether or not there were blinking lights, the battery operated kind, extending across the front of the barricade and the highway? A I observed no blinking lights when I passed there. Q Do you deny there were any? A I do—at the intersection, I do. Q Do you deny they were there even on nights you were not there? A No, when I passed there; I said there were no blinking lights. Q On August Twelfth you don't know what was there because you were not there? A No. * * * I could have passed by there August Twelfth but I didn't keep a record of the dates."

The contractor gave the following answers to interrogatories: Question: "Were any changes made around the area of the collision or within one mile south of the collision, in either the location or type of sign, light or barricade, within 7 days before the collision; 6 days before the collision; 5 days before the collision; 4 days before the collision; 3 days before the collision; 2 days before the collision; 1 day before the collision." Answer: "Defendant states it does not believe there were any changes made within the week preceding the accident." Question: "If so, state exactly each and every change and describe the type of signs, lights or barricades involved." Answer: "See the answer above."

The foregoing evidence is sufficient competent substantial evidence to go to the jury on the issue of the negligence charged. Plaintiff's personal testimony was direct eyewitness testimony. That of the other three witnesses, concerning the absence of lights on nights during the week or two preceding the accident, connected up by the answers to the interrogatories showing that there were no changes in the light situation within the week preceding the accident, was substantial evidence to prove the negative. A negative fact may be proved by negative evidence. Westlake v. Westlake, 201 S.W.2d 964 (Mo.1947); Furman v. St. Louis Union Trust Co., 338 Mo. 884, 92 S.W.2d 726 (1936); Nall v. Brennan, 324 Mo. 565, 23 S.W.2d 1053 (1929); Dodd v. Terminal R. Ass'n of St. Louis, 108 S.W.2d 982 (Mo. App.1937). In Dodd the driver of an automobile struck by a train said he was listening for a bell and could have heard it but that he did not hear a bell. This testimony was held not without probative force; that it constituted substantial evidence of the negative fact to be proved; that the issue raised was one for the jury to determine, and that the court properly ruled in denying defendant's request for a directed verdict.

The contractor, however, contends that the barricade itself and the signs and lights used at the barricade and preceding it, provided excellent warnings of northbound drivers, and constituted adequate warning as a matter of law. The contractor introduced substantial evidence that the barricade was visible for 1200 to 1400 feet south of the intersection; that it had red reflectors on it and was painted with reflectorized paint; that there were signs "ROAD CLOSED", "DETOUR", "KEEP RIGHT" (with arrow pointing the way to Kempf Road), on the barricade; barrels; nine amber flashing lights across the width of the highway, 9 inches in diameter, battery powered, and that they blinked or flashed; that each light was mounted on its own free standing metal horse and stood about 3 feet above the ground; that this condition prevailed on the night of August 12, 1967 and was seen by an eyewitness to the collision, and by a highway patrolman who arrived at the scene thirty minutes later; that one mile south of Kempf Road there was a 4 foot by 4 foot black on yellow sign reading "ROAD CONSTRUCTION AHEAD"; that 100 feet north of that sign there was a black and white sign 6 feet square which read "PLEASE DRIVE CAREFULLY NEXT 1.7 MILES"; that 700 feet further north there was another black and white sign 8 feet by 4 feet reading "HIGHWAY FINANCED ONE HUNDRED PER CENT BY MISSOURI HIGHWAY USERS"; that 1,000 feet south of Kempf Road there was a 4 by 4 foot sign reading "DETOUR AHEAD" and that 500 feet south of Kempf Road there was a diamond-shaped black on yellow reflectorized sign showing a black arrow turning to the right, with two blinking amber lights under it. The contractor confidently assumes the truth of the testimony it introduced concerning lights, signs and precautions, ignoring the rule that the appellate court must accept as true the evidence favorable to the prevailing party, and all reasonable inferences to be drawn therefrom, and ignore contradictory evidence. Under this rule we cannot declare as a matter of law that the evidence introduced by the contractor establishes compliance with the duty of warning. The evidence as to lights was contradicted. Likewise, the existence of the signs was disputed by witnesses Gowert and Braswell. In this situation the existence, adequacy and sufficiency of lights were issues for the jury to resolve. The display of signs en route to the barricade and their display at or on the barricade would not as a matter of law dispense with the necessity of adequately lighting the barricade to notify the public of the location of the barricade.

The contractor also raises the question of causation, contending that as a matter of law the condition of the highway was not a proximate cause of plaintiff's injuries; that there was no evidence that Blevins ran off the highway because of highway conditions or inadequate signs or warnings. The contractor invokes the rule that where the injury could have resulted from several causes for some but not all of which the defendant is liable, and one is as probable as another, there must be substantial evidence tending to show that the cause for which defendant would be liable was the actual cause of the occurrence, otherwise the causal connection remains conjectural and speculative and plaintiff's case must fail. The contractor argues that the cause may have been Blevins' inattention, speed, or intoxication and that the contractor is not liable for these causes and therefore the case was never removed from the realm of conjecture and speculation, and further that it is impossible to conclude that additional warnings would have averted the accident.

The test is whether the facts show that the charged negligence was the proximate cause of the injury. Direct proof of the fact is not required, it being sufficient that the facts proved "are of such a nature, and are so connected and related to each other, that the conclusion therefrom may be fairly inferred." Settle v. St. Louis & S. F. R. Co., 127 Mo. 336, 30 S.W.

125, 126 (1895), or as more recently stated in Swanson v. Godwin, 327 S.W.2d 903, 910 (Mo.1959), that the facts and circumstances proved " 'fairly suggest' negligence as the proximate cause, in the light of ordinary experience." And as pointed out in Swanson v. Godwin plaintiff's evidence "need not exclude all those causes for which defendants would not be liable."

The facts and circumstances in this case are not so conclusive that the court may pronounce one way or the other, as a matter of law, on the question of causation. There are too many variables. Whether Blevins was traveling at 40 or 60 m. p. h.; whether he was intoxicated or sober (there was evidence both ways); whether the barricade was lighted and if so whether the light was sufficient to make the barricade visible in time to have slowed or stopped the automobile short of collision; whether there was sufficient warning to notify travelers of the existence of the barricade and the consequent danger of collision, etc., are matters of fact open to a reasonable difference of opinion on the question of causation and therefore are peculiarly suited to resolution by a jury. This point is ruled against the contractor for the reason that there is sufficient evidence for reasonable minds to differ as to whether the conduct of the contractor was a substantial factor in causing the harm to plaintiff. Restatement of Torts 2d § 434(2)(a).

The contractor next raises the question whether Blevins' actions were an intervening proximate cause, or the sole proximate cause, of the accident. Was Blevins guilty as a matter of law of negligence or drunkenness which intervened between the creation of the condition and the injury and thereby broke the chain of causation? The contractor argues that the highway was well marked with warning signs; that Blevins' erratic driving in failing to heed the signs and running off the road was the proximate cause of the accident, and that the highway conditions were only a circumstance of the accident and not its proximate cause.

Again, we cannot decide the question of intervening proximate cause as a matter of law, for the reason that there was an issue of fact on contradictory evidence on the questions of speed, sobriety and negligence. It was a question for the jury whether Blevins' act in turning off the highway was a normal consequence of a situation created by the contractor's negligent conduct, i. e., whether Blevins acted in normal response to the stimulus of a suddenly-appearing unlighted barricade. "The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." Restatement of Torts 2d § 443. In this connection see McWhorter v. Dahl Chevrolet Co., 229 Mo.App. 1090, 88 S.W.2d 240, 248[12–14] (1935).

### Instruction No. 2?

The next question is whether the court erred in granting a new trial for error in giving Instruction No. 2, which follows:

"Your verdict must be for the plaintiff and against the defendant, Israel Brothers, Inc., if you believe:

"*First,* Israel Brothers, Inc. permitted the barricade to be maintained at night without sufficient and adequate lights thereon, to warn motorists of its existence, and as a result, the highway was not reasonably safe for motorists, and

"*Second,* Defendant, Israel Brothers, Inc., by using ordinary care should have known of the existence of this condition, and

"*Third,* Defendant, Israel Brothers, Inc., failed to use ordinary care to remedy it, and

"*Fourth,* such failure either directly caused damage to plaintiff or combined

with the acts of James Blevins to directly cause damage to plaintiff."

Instruction No. 2 is first assailed on the ground that it imposed upon the contractor a greater duty than that imposed by law, namely, the duty to remedy a dangerous condition of the highway. The contractor contends that its only duty was to exercise ordinary care to place warning signals or lights on the obstruction during the nighttime so as to enable persons using the highway in the exercise of the highest degree of care to discover the danger; that failure to use ordinary care to warn of the barricade should have been submitted in the form of MAI 22.02, but instead plaintiff followed MAI 22.04, which is a form fashioned for use in actions against municipalities in that it obligates a defendant to remedy unsafe conditions; that Instruction No. 2 is misleading in that a jury could interpret it to require the contractor to have *removed* the barricade as one possible way to remedy the condition.

■ In preparing Instruction No. 2 appellant apparently used as models and drew in part from the verdict-directing instruction given in DePung v. City of St. Louis, 425 S.W.2d 509, 511 (Mo.App.1968), and from MAI No. 22.04, for Instruction No. 2 employs much of the language found in those two sources. The obvious intent, and what we think was accomplished, was to submit failure to warn because of inadequate and insufficient lights. Failure to warn was submitted in terms of maintenance of an unsafe condition resulting from inadequate and insufficient warning lights, but in practical and legal effect they are one and the same. Although the language used is a roundabout and unconventional method of submitting failure to warn, the breach of duty hypothesized is essentially and in substance that of failure to warn. No greater duty was thereby imposed upon respondent than that imposed by law. The only reasonable and sensible interpretation of the words "this condition" in the second paragraph and "it" in the third paragraph is the condition of the barricade being maintained at night without adequate and sufficient lights. The suggestion that the words "remedy it" might be construed to require removal of the barricade is farfetched and strained.

■ Next, the contractor condemns Instruction No. 2 on the basis that it failed to require the jury to find that the condition of the highway was not reasonably safe for *drivers* "exercising the highest degree of care"; that the contractor was not required to make the highway reasonably safe for careless or intoxicated *drivers*. (The contractor introduced evidence that the driver Blevins was intoxicated.) In support of this contention the contractor cites Gilmore v. Union Construction Co., 439 S.W.2d 763 (Mo.1969); DePung v. City of St. Louis, supra; and Mayberry v. Clarkson Construction Co., 482 S.W.2d 721 (Mo.1972). While the verdict-directing instruction in each of those cases contained the requirement of a finding of the exercise of the highest degree of care by persons using the streets, the person referred to was the driver of the vehicle, who in each instance was the plaintiff. Not so here. Instruction No. 2 was drawn to inform the jury with respect to the relationship and to define rights not as between the highway contractor and the driver of the vehicle, Blevins, as a plaintiff, but as between the highway contractor and the guest-passenger in the vehicle, this plaintiff, David Morris. Plaintiff's duty to look out for his own safety was that of ordinary care, not the highest degree of care; Blevins' negligence was not imputable to him. (There is no contention that plaintiff entered the vehicle and permitted himself to be driven about with full knowledge that Blevins was in an intoxicated condition. See 60 C.J.S. Motor Vehicles § 202, p. 1028. Plaintiff testified that during the several hours he was with Blevins prior to the accident he did not see Blevins take a drink, and stated positively that Blevins was sober.) There was no error in not incorporating in Instruction No. 2

the concept of the highest degree of care on the part of the driver.

The contractor's third attack on Instruction No. 2 relates to the requirement of a finding that the barricade was maintained "without sufficient and adequate lights thereon" and that as a result the highway was not reasonably safe. The contractor questions whether any lights were necessary if adequate warnings were given by other means, citing cases defining the duty in terms of placing lights *or* signals, and argues that if the purpose of warning devices is to impart notice and if notice is accomplished the method or manner is immaterial; that the lights alone did not have to be adequate; that its duty is to provide adequate warning, not adequate lights, and therefore the instruction applied the words "adequate" and "sufficient" to the wrong noun; that the jury could find that respondent's warning signs *plus* its lights, acting together, provided adequate warning and still find against the contractor if the lights alone were not adequate. The use of the two adjectives in the conjunctive, "sufficient and adequate", is criticized as argumentative, and complaint is made that they are not defined, so that the jury had a roving commission. Exception is taken to the word "thereon", the contention being that the requirement that the lights be ON the barricade precluded consideration of all warnings and lights in the vicinity of but not actually mounted upon the barricade.

 We find no merit in these several criticisms. There is no question that failure to light a dark obstruction in a public highway may constitute negligence, under the particular circumstances of a given case. Whether the contractor in this case was negligent in failing to provide adequate and sufficient lights was the issue tried: the common law duty to warn of a dangerous condition. There was no mistake about that being the issue. Counsel for the contractor, in argument to the jury, said, "The question here is whether or not the barricade there at Highway 21 and

Kempf Road was sufficiently and adequately lighted at night. * * * The burden is on the plaintiff to cause you and make you believe the barricade was inadequately and insufficiently lighted and that this created a condition that was not reasonably safe." That is the question submitted to the jury, affirmatively by Instruction No. 2 offered by plaintiff, and conversely by Instruction No. 3 offered by the contractor. Implicit in the verdict is a finding that no proper warning of the barricade was given because of inadequacy and insufficiency of lights. If the contractor wished to defend on the basis that regardless of the sufficiency of the lights its duty to warn was satisfied by the erection of signs, placement of barrels, etc., it could have so pleaded and submitted. Instead, the contractor joined issue on the adequacy and sufficiency of lights, and may not now be heard to complain that it is entitled to a new trial or complete exoneration on some other theory.

The several other complaints under the contractor's third attack on Instruction No. 2 are either without merit or were waived by failure to ask for cautionary instructions or definition instructions.

 For its fourth reason why No. 2 is improper the contractor asserts that the jury was thereby given a roving commission by permitting it to find that the contractor's actions combined with the acts of the driver Blevins caused plaintiff's damages, without defining the word "acts", and plaintiff's verdict-directing instruction against Blevins' administrator, being a res ipsa loquitur submission, did not mention or define any specific acts on Blevins' part. The contractor says it is "well settled that the res ipsa loquitur doctrine cannot be utilized against one of two joint tortfeasors." On the contrary, this is well-established practice, and in a proper case a submission against one defendant charged with specific negligence and another charged under the res ipsa loquitur theory may be approved. See Rothweiler v. St. Louis Pub. Serv. Co., 361 Mo. 259,

234 S.W.2d 552[1] (banc 1950); Hornberger v. St. Louis Pub. Serv. Co., 353 S.W.2d 635 (Mo.1962); Long v. St. Louis Pub. Serv. Co., 288 S.W.2d 417 (Mo.App. 1956). It is true that if a plaintiff adduces evidence which conclusively shows that the negligence of one of two joint defendants was the sole cause of the accident, or if plaintiff's evidence with respect to the negligence of the one repels any inference of negligence on the part of the other, plaintiff cannot recover. Such a claim is usually made by a defendant charged under the res ipsa loquitur theory, who considers that plaintiff's proof against the other defendant charged with specific negligence is so specific that it identifies the cause of the accident. The contractor, charged here with specific negligence, makes no such claim with respect to plaintiff's proof.

The contractor argues that "[p]roof and submission of specific acts of negligence on the part of Blevins such as his intoxication or speed, tended to relieve defendant Israel Brothers of liability, and on the other hand, the negligence of Israel Brothers would account for Blevins leaving the highway so that no presumption of negligence would arise." The import of the quoted argument is unclear. There was no submission of specific acts of negligence on Blevins' part. The only submission with reference to the movement of the automobile was that "the auto driven by James Blevins left the highway and ran over an embankment off the highway." The contractor does not explain how this submission, or its evidence that Blevins' blood had a sufficient amount of alcohol in it to make him intoxicated, would ipso facto relieve the contractor of liability. Nor do we see how the quoted portion after the words "on the other hand" can be of any assistance to the contractor; that seems to be favorable to Blevins' administrator. We find no merit in the argument or the point.

The jury was not given a roving commission as to the liability of the contractor, but was required to find specific negligence in order to bring in a verdict against that defendant. There is substantial competent evidence of specific negligence on the part of the contractor. It was proper to submit against Blevins' administrator upon the res ipsa loquitur theory while at the same time submitting against the contractor on specific negligence. Plaintiff's evidence does not conclusively show that the negligence of Blevins was the sole cause of the accident. Nor does plaintiff's evidence repel any inference of negligence on the part of the contractor. Under Instruction No. 2 the jury was properly authorized to find this a case of joint and concurring negligence. The reference in the fourth paragraph to the acts of James Blevins properly related to what was submitted in Instruction No. 3, namely, the movement of the automobile driven by Blevins leaving the highway and running over the embankment off the highway.

The contractor's citation and quotation from Dwyer v. Moss, 462 S.W.2d 645 (Mo. banc 1971), hits wide of the mark. The question in that case was whether the res ipsa loquitur doctrine applies when the driver of a motor vehicle sues the driver of another motor vehicle for injuries arising out of a collision occurring while both vehicles are moving along the highway. In addition to the difference in the factual situations in the two cases, there was in Dwyer no question of joint submission of res ipsa against one of two joint defendants and specific negligence against the other.

The contractor further claims, without demonstrating, that Instruction No. 2 was not supported by the evidence, but our review shows that there was evidence to support this instruction.

Finally, the contractor asserts that the second paragraph of Instruction No. 2 should have read "knew or should have known" rather than "should have known", and therefore there was a deviation from MAI. Since there was no applicable MAI instruction there was nothing to deviate from. While the suggested language

would have been better, that used was not fatal, since constructive knowledge in this situation would be sufficient notice for liability to attach.

The court erred in granting a new trial for error in Instruction No. 2.

### Excessiveness, Remittitur

Plaintiff claims error in finding the $480,966 verdict excessive and ordering a $200,000 remittitur; that considering the injuries and losses sustained[1] the evidence clearly supports a verdict and judgment for $480,966. In finding the verdict excessive the trial court ordered that "if plaintiff will remit the sum of $200,000.00 from the verdict and judgment of April 2, 1971 defendant's motion for a new trial will be overruled; otherwise sustained on the ground that the verdict is excessive. Said order of remittitur to be effective in the event the Court's ruling granting a new trial be reversed. In event of such remittitur new judgment shall be in sum of $280,966.00."

 This order constituted a ruling upon the weight of the evidence. Roderick v. St. Louis Southwestern Ry. Co., 299 S. W.2d 422 (Mo.1957); Sanders v. Illinois Central R. Co., 364 Mo. 1010, 270 S.W.2d 731 (banc 1954). "In considering excessiveness of the verdict, the trial court had the right to weigh the conflicting evidence and evaluate all of the evidence in the light of its opportunity to see, hear and observe plaintiff and all other witnesses. In reviewing the action of the trial court, we do not weigh the evidence, but we do examine the record to determine whether there is substantial evidence to support the ruling. If the evidence, viewed in the light most favorable to the ruling, affords reasonable and substantial support of it, then it must be sustained. Steuernagel v. St. Louis Pub. Serv. Co., 361 Mo. 1066, 238 S. W.2d 426, 431." Wilhelm v. Haemmerle, 262 S.W.2d 609, 612 (Mo.1953). "It is only where the trial court has abused its discretion in ordering a remittitur, or in failing to order a remittitur, or in the amount of remittitur ordered, that a judgment is reviewable by this court. Dodd v. Missouri-Kansas-Texas R. Co., 354 Mo. 1205, 193 S.W.2d 905." Williamson v. Wabash R. Co., 355 Mo. 248, 196 S.W.2d 129, 134[9] (1946). In Bine v. Sterling Drug, Inc., 422 S.W.2d 623 (Mo.1968), the trial judge cut a $175,000 verdict to $125,000, and defendant appealed, requesting a further reduction. In upholding the action of the trial judge this court quoted from Couch v. St. Louis Public Service Co., 173 S.W.2d 617, 626 (Mo.App.1943), as follows: "[W]hen the trial court * * * actually considers the matter of the excessiveness of the verdict and, by ordering a remittitur, gives an affirmative expression of its own considered view as to what the size of the verdict should be, the appellate court, while concededly not bound by the trial court's action, nevertheless accords it very great weight, and indeed regards it as so strongly persuasive that except in a case which calls unmistak-

---

1. Appellant points to the following evidence relating to this now 20-year-old plaintiff: Not employable and never to be employable. Minimum economic loss of $176,000 to $197,-000. Multiple fractures of the skull, producing organic brain syndrome and diffuse injury to the brain. Enucleated right eye. Multiple impacted fractures of the face with craniofacial separation. Midfacial parathesia and scarring from nose to lip. Multiple impacted fractures of the nose. A cast or retardation about the face because of retarded bone growth in the area and hyperletorism. A pneumothorax of the left lung. Fractures right clavicle with overriding fragments. Severely comminuted fractures of the left radius and ulna, producing shortening of the left radius. Fractures of both right and left femurs resulting in bayonet apposition healing, with shortness in the right leg. Suffers from headaches, bursts of temper leading to physical rage and violence, a personality change coupled with an awareness of his disfigurement and retarded appearance. Experiences radical, impulsive behavior. Continues taking tranquilizers and anticonvulsants. Lost ability to taste and smell properly. Confined to hospitals on 9 separate occasions, together with 10–12 additional outpatient clinic visits. 53-year life expectancy.

ably for a greater reduction, the judgment left to stand by the trial court will not be disturbed on the appeal." The same deference to the action of the trial court is to be accorded in a case such as this, where the plaintiff appeals, urging restoration of a cut in the verdict.

■ Our review does not convince us that this is a case calling unmistakably for restoration of the $200,000 ordered remitted, or that in making that order the circuit judge was guilty of any abuse or arbitrary exercise of discretion. The evidence, viewed in the light most favorable to the ruling, affords reasonable and substantial support for it. The record demonstrates serious, permanent, deforming and totally disabling injuries, accompanied by dismaying pain and suffering, past, present and future, brain damage, personality change, and inability to earn a living, sustained by a 14-year-old with a life expectancy of 53 years. We cannot conclude, however, that the trial judge abused his discretion in ruling excessive a verdict of $480,966.

On the size of the remittitur ordered, we cannot reasonably conclude that the amount left if plaintiff files the remittitur ($280,966) is so shockingly inadequate as to impeach the trial court's exercise of discretion. Even in these times of inflation and decreasing value of the dollar, $280,966 is a very substantial award. In the proper exercise of discretion the trial court could find this sum fully adequate to reasonably compensate plaintiff for his pain and suffering, physical injuries and disabilities and losses, however severe and distressing they are.

With respect to the question of remittitur: Plaintiff did not file a remittitur in the trial court, not having been given that opportunity in the order made with reference to the contractor's after-trial motions. The remittitur order made in the contractor's case was to become effective only "in the event the Court's ruling granting a new trial be reversed." That could not happen until after the appellate court had reviewed the case on appeal. Plaintiff was justified in withholding his decision on whether to remit until that came to pass. This takes the case out of the general rule that once plaintiff has refused to remit a portion of the verdict he will not be given a second chance. See Greco v. Hendricks, 327 S.W.2d 241, 248[9] (Mo.1959). (In Greco the trial court fixed a time limit within which plaintiff would be allowed to file a remittitur in the trial court. Not so here.)

Accordingly, the order and judgment granting a new trial for error in Instruction No. 2 is reversed; the order and judgment finding the verdict of the jury excessive and ordering a new trial on the ground of excessiveness unless plaintiff enters a remittitur of $200,000, in which event a new judgment be entered for $280,966, is affirmed; and the cause is remanded with directions to fix a reasonable time within which to allow plaintiff to file a remittitur in the sum of $200,000, failing in which a new trial shall be granted as to both defendants, on all issues. In the event of the filing of a remittitur in the sum of $200,000 the new judgment shall be entered as of April 2, 1971 and carry interest from that date.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.